# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## DEARY CARR v. COMMONWEALTH.

### November 16, 1922.

1. APPEAL AND ERROR—*Homicide—Questions of Law and Fact—Conflict in Evidence—Credibility of Witnesses.*—In a prosecution for homicide, conflicts in the evidence, and questions as to the credibility of the witnesses, are addressed to the jury, and, if material to the case, must be regarded as settled adversely to the accused by a verdict of guilty.

2. HOMICIDE—*Mutual Combat—Self Defense—Case at Bar.*—In the instant case, a prosecution for homicide, the jury might well have regarded the actual order and number of shots as of minor importance. There was abundant evidence upon which to base the belief that each of the parties intended to kill the other, and that the shooting was a mutual and voluntary affray for which each was more or less to blame and as to which neither could have justly claimed self-defense. Each had threatened to kill the other, and each had armed himself for the encounter. The deceased was evidently looking for defendant, and there was evidence sufficient to warrant the jury in believing that defendant was courting armed combat with deceased.

3. HOMICIDE—*Mutual Combat—Self-Defense.*—When two persons enter willingly into a combat, not for self-protection but to gratify their passion by inflicting injury upon each other, the doctrine of self-defense cannot be invoked on behalf of either.

4. HOMICIDE—*Justifiable Homicide—Self-Defense—Necessity for Killing Created by Defendant.*—With regard to the necessity that will justify the slaying of another in self-defense it would seem that the party should not have wrongfully occasioned the necessity; for a man shall not in any case justify the killing of another by a pretense of necessity, unless he were without fault in bringing that necessity upon himself.

5. HOMICIDE—*Instructions—Assumption of Facts—Overlooking Testimony in Behalf of Accused—Self-Defense—Case at Bar.*—In the instant case, a prosecution for homicide, the court instructed the jury that if they believed from the evidence that defendant shot and killed deceased, and that at the time of the shooting defendant had his gun up and ready to shoot deceased, while a companion had hold of deceased, which accused knew, then deceased had the right to shoot at defendant in

order to protect himself, and defendant could not invoke the doctrine of self-defense. Accused objected to this instruction on the ground that it overlooked the details of the testimony in behalf of the accused as to the number and order of the shots fired and as to the threatening manner in which the deceased was approaching, and also that it assumed facts which did not exist. There were, however, instructions for defendant in the case, which dealt specifically with the theory of the accused as to the threatening manner in which the deceased was approaching him. The instruction did not assume any facts, but upon a fair construction of it the jury might have understood that it was left to them to find the facts from the evidence.

*Held:* That there was no error in the instruction in question.

6. HOMICIDE—*Mutual Combat—Self-Defense—Instructions.*—In a prosecution for homicide the evidence fully justified the submission to the jury of the question of whether or not the participants in the shooting, which resulted in the homicide, were looking out for each other and engaged in a voluntary mutual combat.

*Held:* That an instruction that merely submitted this question to the jury and which did not tell the jury of what grade of offense they must find the accused guilty if they believed that the shooting resulted as suggested in the instruction, but merely told them that in such event accused could not rely upon self-defense, was not error.

7. HOMICIDE—*Instructions—Mutual Combat Because of Threats.*—In a prosecution for homicide, the court instructed the jury that if they believed that "both the accused and the deceased made threats one against the other, and that because of said threats each armed himself against the other," etc., it was urged that this instruction was wrong in using the words "because of said threats," as there was no evidence that accused's threats had been mentioned to deceased.

*Held:* That though the language objected to was perhaps an inaccuracy, it was not harmful to accused. The question not being whether they armed themselves because of the threats, but whether they had actually made the threats and intended to carry them out. The threats, as showing a state of mind, and not their communication, were circumstances tending to prove a mutual and voluntary encounter.

8. HOMICIDE—*Evidence—Previous Difficulties Between Accused and Deceased—Instructions.*—In a prosecution for homicide, evidence that accused was one of a party which shortly before the homicide rocked a house in which a son of deceased was staying, and that accused on that occasion said, "Bring out the damn Sneads" (the evidence further showing that the difference between accused and "the Sneads" was confined to deceased and his son), was admissible, and there was no error in refusing an instruction that the jury should not consider such evidence.

42

9. HOMICIDE—*Sufficiency of Verdict—Remarks by Court, Commonwealth's Attorney, and Clerk—Case at Bar.*—On a trial for homicide the jury reported their verdict as follows: "We jurymen find the prisoner guilty charge with indictment involuntary manslaughter and fix his punishment as one year in penitentiary." The court thereupon asked if the jury meant to find that the prisoner killed the deceased both accidentally and intentionally at the same time, and the Commonwealth's attorney stated that the indictment in the case covered all phases of killing from murder to manslaughter, or even common assault, and the jury could do as it pleased in rendering its verdict, while the clerk of the court stated to the foreman of the jury that he should fix the degree of crime in his verdict, and the clerk, by direction of the court, then reread the full charge to the jury upon the indictment. Upon a poll the jury disagreed and the court sent them back for further consideration.

*Held:* That there was nothing in this prejudicial to accused.

10. HOMICIDE—*Sufficiency of Verdict—Remarks of Deputy Sheriff—Case at Bar.*—In the instant case, a prosecution for homicide, after the jury returned their verdict, the court asked it what grade of offense it meant to find the prisoner guilty of, and while they were deliberating the deputy sheriff, who had the jury in charge, asked the court in their presence if he could make a statement that might be helpful. The court asked him "what he had to do with it, and he stated 'nothing.' "

*Held:* That no importance whatever could be attached to what the deputy sheriff did, as he was not permitted to say a word to the jury.

11. HOMICIDE—*Sufficiency of Verdict—Alteration of Verdict by Judge.*—On a prosecution for homicide the jury returned the following verdict: "We jury find the prisoner guilty within the indictment with voluntary manslaughter and fix his punishment one year in State penitentiary." The court then directed the clerk to place the verdict in the following form: "We, the jury, find the prisoner guilty of voluntary manslaughter and fix his punishment at one year confinement in the penitentiary."

*Held:* No error.

12. VERDICT—*Criminal Law—Offenses Charged in Indictment and Punishment—Instructions—Charge by Clerk, Court and Commonwealth's Attorney.*—In view of an apparent confusion in the minds of the jury upon reporting their verdict as to the grade of the offense, it is entirely proper for the court to further enlighten them. Proper practice is for the court to have the clerk, under its direction, inform the jury plainly as to the offenses charged in the indictment and the punishment therefor; but a charge covering these points and given partly by the court, partly by the clerk, and partly by the Commonwealth's attorney, though irregular, is not erroneous, if no prejudice results to the prisoner.

13. VERDICT—*Disagreement—Sending Jury Back to the Jury Room.*—Where upon a poll of the jury it was found that they were not agreed on the verdict, it was insisted by accused that the jury ought to have been discharged instead of sending them back to the jury room, but there is clearly no merit in this contention.

14. VERDICT—*Disagreement—Sending Jury Back to the Jury Room—Fixing Grade of Offense.*—In the instant case, a prosecution for homicide, there was no error in sending the jury back to the jury room the second time to fix the grade of the offense. That was a matter of substance in respect to which it was proper to send them back to their room.

15. VERDICT—*Disagreement—Sending Jury Back to the Jury Room—Amendment of Verdict in Open Court by Direction of Court.*—A final correction or amendment of a verdict, as to a matter of form only, made in open court and by the direction of the court, was not improper, and it was not necessary to send the jury back with respect thereto.

16. HOMICIDE—*Sufficiency of Verdict—Reference to Indictment—Name of Accused or Deceased.*—It was objected to a verdict in a prosecution for homicide that it undertook to find the defendant guilty of voluntary manslaughter "without stating who were charged or aught else; it is plainly not responsible to the charge nor the indictment and bears no connection whatever with it." There was no force in this objection. The verdict did not refer to the indictment, and did not use the name of the accused or deceased, but when read in connection with the record of which it became a part, it clearly acquitted defendant of everything embraced in the indictment except voluntary manslaughter, and it clearly convicted him of that offense in and upon the body of deceased.

17. VERDICT—*Writing.*—Although contrary to the better and usual practice, a verdict may be good though not reduced to writing by the jury.

18. HOMICIDE—*Indictment—Manslaughter Included in Indictment for Murder.*—The offense of voluntary manslaughter is included in an indictment for murder.

Error to a judgment of the Circuit Court of Nelson county.

*Affirmed.*

The opinion states the case.

J. C. Payne, Edward Meeks and J. T. Coleman, Jr., for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General*, and *Leon M. Bazile, Second Assistant Attorney-General*, for the Commonwealth.

KELLY, P., delivered the opinion of the court.

The defendant, Deary Carr, shot and killed one Dock Snead. He was indicted for murder, found guilty of voluntary manslaughter, and sentenced to the penitentiary for one year. To that sentence this writ of error was awarded.

The evidence, although greatly conflicting in some respects, shows that bad feeling existed between certain members of the Carr and Snead families. Sometime before the killing, Deary Carr's house had been "shot up" in the night time, and some of his horses and saddles carried off, by a party of which Horty Snead, a son of the deceased, was a member. Subsequently, and about eleven o'clock on Sunday night, two days before the killing, the house of Howard Carr, at which Horty Snead was making his home, was also attacked and rocked. Deary Carr testified that he was not in the attacking party, but there was direct and positive testimony to the contrary, which, if true, showed that Deary Carr broke down the door to the house and that he said, "Bring out the damn Sneads." Horty Snead was in the house at that time but his father was not there.

On the day of the homicide Deary Carr accompanied his father, Howard Carr, to the latter's house for the alleged purpose of repairing the damage done by the attack on the previous Sunday night. A number of persons were already at the house, including Dock Snead, Horty Snead, Cleese Carr, a brother of Deary Carr, and two of his unmarried sisters. Deary Carr

had previously ordered Horty Snead to stay off the premises, and finding him there on that occasion reminded him of that order in such a peremptory manner that Horty jumped over the porch banister and ran away. Deary Carr's remarks to Horty Snead, and his threatening attitude towards him, resulted in a fight between Dock Snead and Deary Carr. It is difficult from the conflicting evidence on the subject to fix, or perhaps we should say to apportion, the blame for this fight. Dock Snead was armed and was intoxicated, and Deary Carr was at that time unarmed and apparently sober. In one view of the evidence, a jury might have believed that Deary Carr made an unprovoked and felonious assault on Dock Snead. In another view, it might very well have been found that Snead was the aggressor. However this may be, Carr got the better of the fight, striking Snead with a piece of plaster or some heavy substance, badly bruising and disfiguring his face and rendering him temporarily unconscious. In the meantime, Howard Carr got possession of Dock Snead's pistol and turned it over to his son Deary. In a few minutes after this fight Dock Snead rallied from the effect of his injuries, and, with the aid of Cleese Carr, chased Deary Carr and his father off of the premises and fired a shot gun at them as they ran. The evidence as to this whole disgraceful performance is involved in more or less conflict and confusion, and the details of the occurrence are rendered all the more abhorrent by the part which Cleese Carr, a sixteen year old boy, took in arraying himself against and assaulting his father and brother. It is suggested in the brief for the accused that the Sneads had led this young boy and the two Carr girls into a life of shame, and were thus responsible for their hostile and unnatural attitude and complicity in the affair. We do not find that this sug-

gestion is very well warranted by the record, but the whole situation was distressingly bad at best, and there was fault on both sides.

Deary Carr testified that he made no threats at any time against Dock Snead, but it appears from the testimony of the Commonwealth that at the Howard Carr house, and about the time of the fight, he said: "If I didn't kill him I am going to kill him," and that, "By G—d he was going to kill or be killed." Furthermore, one witness for the Commonwealth testified that he saw Deary Carr on the morning of the tragedy with a gun and heard him say "he was going to tell Dock Snead what he had done to Horty and had made up his mind to kill or be killed." This alleged reference to "what he had done to Horty," referred to an attack he had made on Horty after he found that the latter had been a participant in the night attack on Deary Carr's house. It does not appear that these threats were heard by or communicated to Dock Snead.

The evidence further shows that at the Howard Carr house on the day of the fight Dock Snead had said: ' Deary, don't you believe I will kill you this day?" This statement or question was interpreted by Deary Carr himself and those who heard it as a murderous threat. There was evidence also to show that Snead had threatened Carr prior to the day of the tragedy, and Carr testified that he had heard of such threats.

After Deary Carr left the Howard Carr house he applied to a magistrate for a warrant against Dock and Horty Snead and Cleese Carr. In the meantime both he and Dock Snead had armed themselves, each with a single barrel shot gun. Deary Carr was walking along the public road in company with two of his brothers, Ernest and Miller, and also with the magistrate and a deputy sheriff and others, going, as Deary Carr testified,

"to attend to this matter at the hands of the law." The officers had refused to go to the Howard Carr house, but had agreed to go to Deary's house. They were proceeding along the road towards the latter's home when, just as they rounded a curve in the road, they met Dock Snead and his son-in-law, Newton Fitzgerald. As soon as Snead and Carr came in sight of each other the shooting began. As to just what happened at that juncture there is a conflict of evidence. It is only fair to the accused to say that the testimony of all of the eye witnesses, save Newton Fitzgerald, tends to show that Snead shot first, that both parties fired twice, and that Snead was killed by Carr's second shot. If the duel was carried on in this way, each party had to eject an empty shell and reload. Carr says this was done, and in this he is corroborated by other witnesses and by circumstances. An empty shell was found on the ground near Snead and another like it in his gun.

Newton Fitzgerald, however, testified as follows: "I tried to keep Snead from going up the road. We walked on and heard someone coming. I had my arm around Snead's; when we came in sight the Carrs raised gun. I reached around and seized gun in hands of Snead and said: 'For God's sake don't shoot or have trouble.' The gun went off towards the river as best I could tell. Snead's gun went off first. Deary Carr shot at him twice. Miller Carr fired at him with a pistol. * * * Snead was shot in the right side and arm. * * * I know very little of the actual shooting except that Dock Snead shot first; as soon as I saw that shooting was going to be done, I sprang to the bank and went into the bushes. Snead's gun went off once and was not reloaded. Right after the shooting Deary said that he had to do it."

[1] It is shown, and not disputed, that the fatal shot

tore away a part of Snead's right arm and entered his right side. This fact in a measure corroborates Newton Fitzgerald. In nearly all other respects his testimony is seriously contradicted and apparently discredited. However, the same thing may be said, though in much less degree, as to one or more witnesses for the defense. These contradictions, and the question as to the credibility of the witnesses, addressed themselves to the jury, and, if material to the case, must be regarded as settled adversely to the accused by the verdict.

[2] In our view of the case, however, the jury might well have regarded the actual order and number of shots as of minor importance. There was abundant evidence upon which to base the belief that each of these parties intended to kill the other, and that the shooting was a mutual and voluntary affray for which each was more or less to blame and as to which neither could have justly claimed self-defense. Each had threatened to kill the other, and each had armed himself for the encounter. Snead was evidently looking for Carr, and there was evidence sufficient to warrant the jury in believing that Carr was courting armed combat with Snead. He had, it is true, asked for a warrant, but he was manifestly expecting to accompany the officers in making the proposed arrest. At least one witness for the Commonwealth said that Deary Carr's two brothers who were with him at the time each had a pistol. Deary Carr had said that he was going to kill or be killed. There was every indication that both he and his antagonist were bent on violence.

[3] In 25 Am. & Eng. Enc., 2 Ed., 266, the rule applicable to this state of facts is stated thus: "When two persons enter willingly into a combat, not for self protection but to gratify their passion by inflicting injury upon each other, the doctrine of self-defense cannot be invoked on behalf of either."

The law as thus stated is of practically universal recognition, and is unquestionably the law in this State.

[4] In *Vaiden's Case*, 12 Gratt. (53 Va.) 717, 729-30, Judge Lee, who delivered the opinion of the court, said: "With regard to the necessity that will justify the slaying of another in self-defense, it should seem that the party should not have wrongfully occasioned the necessity; for a man shall not in any case justify the killing of another by a pretense of necessity, unless he were without fault in bringing that necessity upon himself." This pronouncement, as said by Judge Buchanan in *Jackson's Case*, 98 Va. 845, 848, 36 S. E. 487, 488, has been "quoted approvingly by this court in subsequent cases, and is fully sustained by the later as well as the older text writers." *Vaiden's Case* is approved in an opinion by Judge Burks which we are handing down today in the case of *Sims* v. *Commonwealth, post* p. 736, 115 S. E. 382. Both the *Vaiden Case* and the *Sims Case* presented more plausible grounds for invoking the doctrine of self-defense than the case at bar, but in each of them that defense was rejected.

In view of what has already been said about the facts and the law of the case, it is manifest that the first assignment of error, which complains of the action of the court in refusing to set aside the verdict because contrary to the law and the evidence, is without merit.

The second assignment calls in question the correctness of instructions A, B, and C given at the instance of the Commonwealth.

At the oral argument of this case the objection to instruction A was waived. Instruction B was as follows:

"The court instructs the jury that if they shall believe from the evidence in this cause, beyond a reasonable doubt, that on June 14, 1921, in Nelson county, Virginia, Deary Carr shot and killed Dock Snead, and if

they shall further believe beyond a reasonable doubt that at the time of such shooting the said Deary Carr had his gun up and ready to shoot the said Dock Snead, while Newton Fitzgerald had hold of the said Dock Snead, which the accused knew, then the said Dock Snead had the right to shoot at the said Deary Carr in order to protect himself, and the said Deary Carr cannot invoke the doctrine of self-defense, and they should find the said Deary Carr guilty of some degree of homicide, and punish him, as set out in the charge of the clerk in this cause."

[5] The objection to this instruction is that it overlooks the details of the testimony in behalf of the accused as to the number and order of the shots fired and as to the threatening manner in which the deceased was approaching, and also that it assumes facts which did not exist. In support of this contention counsel for the accused cited the case of *Bowles* v. *Commonwealth*, 103 Va. 816, 830, 48 S. E. 527. The language of the opinion in that case, dealing with the Commonwealth's instruction No. 10 given therein, lends color to the objection urged to instruction B, but we do not regard the decision as controlling here. It does not appear in the *Bowles Case* that the omission of any reference in instruction No. 10 to the manner of the deceased as he approached was satisfactorily supplied by other instructions. Upon the contrary, there seems to be an intimation that if instruction No. 7a asked for by the prisoner had been given the fault which the court found with instruction No. 10 would have been relieved of the vice for which it was condemned. However this may be, we are fully satisfied that the thirteen instructions given for the defendant in this case, three of which dealt specifically with the theory of the accused as to the threatening manner in which the deceased was ap-

proaching him, left no room for misunderstanding on the part of the jury as to the right of the accused, if any such right he had under the circumstances, to act upon the threatening attitude of the deceased. As to the alleged assumption of facts which did not exist, we do not see that instruction B assumed any facts, but upon a fair construction thereof the jury must have understood that it was left to them to find the facts from the evidence before them.

[6] Instruction C, given for the Commonwealth, was as follows: "The court instructs the jury that if they shall believe from the evidence in this cause beyond a reasonable doubt that both the accused and the deceased made threats one against the other, and that because of said threats each armed himself against the other, and that when they met on the public highway each began to shoot at such other just as soon as he was able, resulting in the deceased being killed by the accused, that then the accused cannot rely upon the law of self-defense as a complete defense, and must be found guilty of some degree of homicide."

There was no error in giving this instruction. It simply submits to the jury whether or not the participants in the shooting were looking out for each other and engaged in a voluntary mutual combat. The evidence, as already pointed out, fully justified the submission of this issue to the jury, and the law of the case is correctly stated therein. The court did not undertake by the instruction to tell the jury of what grade of offense they must find the accused guilty if they believed that the shooting resulted as suggested in the instruction, but merely told them that in such event he could not rely upon self-defense. This is the law. See authorities cited, *supra.*

[7] It is urged that the instruction was wrong in using

the words "because of said threats," the point of the argument being that there was no evidence that Deary Carr's threats had been mentioned to Dock Snead. The language objected to was perhaps an inaccuracy in the instruction, but it was not harmful to Carr. The instruction would have been good if the words "because of said threats" had been omitted, and it was not materially affected by the useless insertion of such words. The question was not whether they armed themselves because of mutual threats, but whether they had actually made such threats and intended to carry them into execution when they met. The threats as showing a state of mind, and not their communication, were circumstances tending to prove a mutual and voluntary encounter, and thus rendering the rule of law announced in the instruction applicable to the case.

[8] It is complained, in the next place, that the court erred in refusing an instruction asked for by the defendant which would have told the jury that they could not consider "any evidence in regard to the rocking of Howard Carr's house on Sunday night prior to the killing of Dock Snead." It will be recalled that the evidence for the Commonwealth showed that Deary Carr was of the party which attacked the Howard Carr house on Sunday night prior to the homicide, and that on that occasion he had said, "Bring out the damn Sneads." The evidence further shows that the difference between Deary Carr and "the Sneads" was confined to Dock Snead and Horty Snead. It was certainly proper, as showing the mental attitude of Deary Carr toward the Sneads, to allow evidence of his conduct on the Sunday night previous at the Howard Carr house. The proposed instruction was a general one and excluded for all purposes all parts of the testimony as to that occurrence. It was right to refuse the instruction in this

form, just as it would have been right to refuse a general
objection to the evidence, if such objection had been
made during the course of the testimony. Further-
more, it is apparent that both the Commonwealth and
the accused introduced proof with reference to the at-
tack on Deary Carr's house and the attack on the
Howard Carr house as pertinent circumstances leading
up to and throwing light upon the final difficulty result-
ing in the homicide. It does not appear that there was
any objection to this testimony when it was offered, and
we are of opinion that even if it had been objected to, it
ought to have been admitted. *Poindexter's Case,* 33
Gratt. (74 Va.) 766; *Wallen* v. *Commonwealth, post* p.
773, 114 S. E. 786.

[9-12] The remaining assignment of error arises in
this way:

After the completion of the evidence and the instruc-
tions by the court and the argument by counsel, the
jury retired to their room and after some time reported
the following verdict: "We jurymen find the prison
guilty charge with indictment involuntary manslaugh-
ter and fix his punishment as one year in penitentiary."

The court thereupon asked if the jury meant to find
that the prisoner killed the deceased both accidentally
and intentionally at the same time, and the Common-
wealth's attorney stated that the indictment in the case
covered all phases of killing from murder to manslaugh-
ter, or even common assault, and the jury could do as it
pleased in rendering its verdict, while the clerk of the
court stated to the foreman of the jury that he should
fix the degree of crime in his verdict, and the clerk, by
direction of the court, then reread the full charge to the
jury upon the indictment. The prisoner by counsel
then requested that the jury be polled on the verdict,
and, after some jurymen had said it was their verdict

and others had answered to the contrary, the poll ended without a full call, the court again sending the jury back to their room for further consideration. After some time they returned, reporting the following verdict: "We jurymen find prisoner guilty as charged with indictment and fix his punishment as one year in State penitentiary."

The court then asked the jury what grade of offense they meant to find the prisoner guilty of, and while they were deliberating the deputy sheriff, who had the jury in charge, asked the court in their presence if he could make a statement that might be helpful. The court asked him "what he had to do with it," and he stated "nothing." The court then again sent the jury to their room for further consideration as to their verdict, and they returned later with the following report: "We jury find the prisoner guilty within the indictment with voluntary manslaughter and fix his punishment one year in State penitentiary." The court then directed the clerk to place the verdict in the following form: "We the jury find the prisoner guilty of voluntary manslaughter and fix his punishment at one year confinement in the penitentiary." This was done, and the verdict was entered of record accordingly.

The prisoner by counsel, as the foregoing incidents took place, objected to the action and statements of the court, the clerk, the Commonwealth's attorney, and the deputy sheriff, respectively.

We perceive nothing in any of these things which could in any way be regarded as prejudicial to the accused. It is perfectly manifest that no importance whatever can be attached to what the deputy sheriff did. He was not permitted to say a word to the jury, nor is there any intimation of what he intended to say. The statement by the Commonwealth's attorney to the

jury, and likewise the statement by the clerk to the foreman, were made in the immediate presence of the court and at a time when the verdict of the jury was not complete. They had reported a verdict, but it had not been received by the court, and it turned out upon the poll of the jury not to be their verdict. What the Commonwealth's attorney said was somewhat out of order in point of time, but he might very properly have said the same thing to the jury before they retired the first time, and what he did say was as beneficial as otherwise to the prisoner because it called attention to the minimum punishment which the jury might impose if they saw fit. So, too, what the clerk said, and the re-reading of the charge to the jury under the order of the court, while somewhat irregular and unusual, was not improper. In view of the apparent confusion in the minds of the jury as to the grade of the offense, it was entirely proper for the court to further enlighten them. In *Porterfield's Case,* 91 Va. 801, 803, 22 S. E. 352, it was held that proper practice is for the court to have the clerk, under its direction, inform the jury plainly as to the offenses charged in the indictment and the punishment therefor; but that a charge covering those points and given partly by the court, partly by the clerk, and partly by the Commonwealth's attorney, though irregular, is not erroneous if no prejudice results to the prisoner. None did result in this case.

[13-15] It seems to be seriously insisted that the court ought to have discharged the jury instead of sending them back, but there is clearly no merit in this contention. It is everyday practice when it is found that the jurymen have not agreed upon a verdict to send them back for further deliberation. That, in effect, is just what occurred in this case. It is equally clear that there was no error in sending the jury back the second

time to fix the grade of offense. That was a matter of substance in respect to which it was proper to send them back to their room. *Porterfield's Case, supra;* Burks' Pl. & Pr. (2 Ed.), p. 534. The final correction or amendment, as appears from the foregoing statement, which was made in open court and by the direction of the court, was a matter of form only and it was not necessary to send the jury back with respect thereto. *Porterfield's Case, supra;* Burks' Pl. & Pr. (2 Ed.), *supra.*

[16-18] The final point made against the verdict of the jury is that "it undertakes to find the defendant guilty of 'voluntary manslaughter' without stating who, where charged or aught else; it is plainly not responsive to the charge nor the indictment and bears no connection whatever with it." We are unable to see any force in this objection to the form of the verdict. It does not refer to the indictment, and it does not use the name of the accused or the deceased, but of course when read in connection with the record of which it became a part as soon as it was entered on the order book, it clearly acquitted the defendant, Deary Carr, of everything embraced in the indictment except voluntary manslaughter, and it clearly convicted him of that offense in and upon the body of Dock Snead. Of course, it cannot be contended that the offense of voluntary manslaughter was not included in the indictment for murder. (*Benton's Case,* 91 Va. 782, 791, 21 S. E. 495; *Cates' Case,* 111 Va. 837, 841, 69 S. E. 520, 44 L. R. A. (N. S.) 1047.) Although it would have been contrary to the better and usual practice, the verdict would have been good if it had not been reduced to writing by the jury. Burks' Pl. & Pr. (2nd Ed.), p. 529. It had to be reported in open court and entered on the order book, and when so entered, it became a part of the record and left no room

for doubt as to its meaning and effect.   *Hoback* v. *Commonwealth*, 28 Gratt. (69 Va.) 922.

We find no error in the judgment complained of, and it must be affirmed.

*Affirmed.*