## Richmond

LAWRENCE JAMES JONES V. COMMONWEALTH OF VIRGINIA.

June 21, 1954.

Record No. 4224.

Present, All the Justices.

The opinion states the case.

*Ernest S. Merrill* and *Paul Lipkin,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Francis C. Lee, Assistant Attorney General,* for the Commonwealth.

MILLER, J., delivered the opinion of the court.

Lawrence James Jones was convicted of second degree murder for the homicide of Lawyer Cook and sentenced to twenty years' confinement in the penitentiary.

The trial was had before a jury, and accused undertook to show that the killing was (a) by misadventure and accidental, or (b) done in self-defense.

The court instructed the jury upon the theory of accidental killing but refused to give any instruction embodying the law of self-defense, and that ruling is assigned as error.

Cook died on January 8, 1952, from a pistol bullet wound inflicted on January 5, 1952. The autopsy disclosed that he had been wounded in the left hand by a pistol bullet, but that his death was caused by a bullet which entered his abdomen, perforated the intestines and lodged in the pelvic bone on the left side.

During the afternoon of January 5, 1952, at the instance of deceased, accused and two other men went to Cook's home in the city of Norfolk for the purpose of gambling. All of them had been drinking intoxicants and while at Cook's home, they engaged in shooting dice. Deceased was a loser, and he tried, without success, to borrow some money from other players and offered his pistol as security. He secured three dollars by selling a pint of gin to them, and they all partook of the gin.

About 9 p. m. the game broke up and accused left for his home. On the way he stopped by a grocery store to pay a bill, and there discovered that his wallet had been stolen. The theft had been accomplished by cutting his back pocket "all the way down." Upon discovery of the theft accused

returned to Cook's home and knocked upon the door but no response was obtained. He then went to a nearby restaurant and beer tavern operated by Quincy Moore, Jr. Shortly thereafter deceased entered the restaurant, and it appears from the testimony of Moore that accused stated to Moore that he was going to kill Cook. In response to questions propounded by the Assistant Commonwealth's Attorney, this witness testified that Jones came into the kitchen of the restaurant and showed him a pistol and said that Lawyer Cook had taken "some money from him and he was going to kill him, and he asked me not to call the law because he wasn't going to kill him inside." The witness said that accused then left the kitchen and went into the restaurant to where Cook was standing, and a moment thereafter the two men went out of the restaurant, accused being preceded by deceased.

After the killing, accused left the city and was arrested on November 14, 1952, in Chicago, Illinois. He was brought back to Norfolk, and on December 2, 1952, Sergeant L. L. Jones obtained the following statement from him as to what happened when accused met Cook at the restaurant:

"* * * Later on, Lawyer Cook came in. I asked him did he see my wallet up to his house and he said, 'No.' I told him that I must have lost it there because I hadn't been nowhere from there to home.

"Lawyer Cook told me to come on outside if I wanted to talk to him so we went on outside the restaurant. I asked him again did he have my wallet. He didn't say anything. I told him if he had the wallet, just give me it back and keep the money. Then he told me did I want to make anything out of it. I told him if he had my wallet, it didn't make any difference to me.

"He started to take his hand from his pocket and it came out of his pocket and I grabbed his arm and he had a pistol. As we were tussling over the pistol, he fired twice. He turned around and ran. He ran up on the porch next door

and I ran up behind him. He told me not to shoot anymore, that he would tell me where the money was.

"As I turned around to walk off the porch, Lawyer Cook jumped on my back. Both of us fell on the sidewalk and the pistol fell out of my hand. We both of us got off the ground. Lawyer Cook got the gun. He told me not to come up on him. I walked away from there. I went to the Greyhound Bus Station. I got a ticket for Washington, D. C., and then went to my uncle's house in Chicago and stayed there for two months and then I got a room by myself and stayed there until November 14th of this year when I got picked up."

No one other than accused testified as to how the killing occurred. When he testified in his own behalf, he said that when Cook came into the restaurant, he asked him "to go back to his house to see if I lost my money," but Cook said that he was not going back home. The two men then went outside, and this is what occurred on the outside of the restaurant:

"A. * * * He asked me who I thought had the money and I said that I wasn't sure. He asked me if I thought he had it. I said, 'I don't know.' He was the closest one to me while gambling, so I told him he must have it. We started arguing.

"He asked me if I wanted to make anything out of it. I told him it didn't make any difference with me. He put his hand in his pocket and he had a pistol. The pistol went off about three times when we were tussling. I twisted his hand and got the pistol. He ran on the porch. He told me he had the money and he would give it to me.

"I turned around to come back and he jumped on my back and we both fell off the porch and knocked the gun out of my hand. He had the pistol and he told me not to come up on him. He walked off and I walked off. I had been drinking. I saw blood all over my hand and I was scared. I did the first thing that come up to my mind. I left."

Accused said that he had never owned a pistol since he had been in Norfolk and knew of no reason why Moore should have testified that he had threatened to kill Cook.

The Attorney General contends that the evidence clearly shows that accused was the aggressor or that he voluntarily engaged in mutual combat and thus he is not entitled to any instructions on the law of self-defense.

"The general rule is that one can not provoke an attack, bring on a combat, and then slay his assailant, and claim exemption from the consequences on the ground of self-defense. No one can avail himself of the plea of self-defense, in case of homicide, or assault with intent to murder, when the defendant was himself the aggressor, and wilfully brought on himself, without legal excuse, the necessity for the killing, or the assault made. He who provokes a personal encounter, in any case, thereby disables himself from relying on the plea of self-defense in justification of a blow which he struck during the encounter." 1 *Michie*, Homicide, § 112(1), p. 339. *Sims* v. *Commonwealth*, 134 Va. 736, 761, 115 S. E. 382; *Perkins* v. *Commonwealth*, 186 Va. 867, 44 S. E. (2d) 426; 9 M. J., Homicide, § 42, p. 380.

"When two persons enter willingly into a combat, not for self protection but to gratify their passion by inflicting injury upon each other, the doctrine of self-defense cannot be invoked on behalf of either." 25 Am. & Eng. Enc., 2d ed., 266, cited with approval in *Carr* v. *Commonwealth*, 134 Va. 656, 664, 114 S. E. 791. 26 Am. Jur., Homicide, § 128, p. 243.

The instruction given upon the theory that the killing was accidental is as follows:

"The court instructs the jury that if, from all of the evidence taken together, there is a reasonable doubt whether the defendant killed Cook intentionally or Cook started to pull the gun from his pocket and the defendant grabbed his hand to prevent him from using the pistol, and in the ensuing scuffle the pistol was accidentally discharged, wounding the

deceased, from which wound he died, then you must find the defendant not guilty."

This instruction is supported by evidence and was rightly given.

However, the evidence and inferences deducible therefrom may be such at times as to justify the submission of whether or not the killing was in self-defense, as well as whether or not it was accidental. In such case, if either inference may be reasonably drawn, accused is entitled to have both issues submitted to the jury. *Braxton* v. *Commonwealth*, 195 Va. 275, 77 S. E. (2d) 840; *Valentine* v. *Commonwealth*, 187 Va. 946, 48 S. E. (2d) 264.

Accused was not asked the direct question of whether or not he told Moore that he was going to kill Cook, but in his testimony he inferentially denied that he made such a statement. He had a lawful right to inquire about his stolen wallet, and no witness testified that he made any overt act toward Cook. If this testimony is believed, the jury could well conclude that he neither provoked the encounter nor willingly entered into mutual combat, but merely sought to defend himself when Cook drew his pistol. Different inferences, *i.e.*, accidental killing or killing in self-defense, might be reasonably drawn from what was said and done. Under such circumstances accused was entitled to have both of his theories of the case submitted to the jury, and an appropriate instruction upon the theory of self-defense should have been given by the court. Refusal to instruct upon this theory was prejudicial. *Braxton* v. *Commonwealth, supra.* .

Numerous questions asked by the Assistant Commonwealth's Attorney during the trial and statements made by him in argument, and the court's rulings on objections thereto are assigned as error. Typical of part of the interrogation of witnesses are the following extracts. When cross-examining accused on what statements he had made to Officer Jones, the Assistant Commonwealth's Attorney asked the following questions and made these observations:

"Q. Do you deny you made that statement to him?

"A.  If I did, I didn't remember saying that.

"Q.  That hurts, doesn't it?"

This statement was objected to and the court struck it out. Yet in a moment the same improper examination was resumed, objected to and ruled on as follows:

"Q.  Now you say you didn't know what the pistol looked like?

"A.  All I know is it was a revolver.

"Q.  I know this hurts, but—

"Mr. Merrill:  I am going to move for a mistrial.  There isn't anything that hurts about this cross examination except the unfairness of it.  I move for a mistrial on the ground of the improper remarks made by the Commonwealth's Attorney.

"The Court:  Overruled.

"Mr. Merrill:  Exception."

During his closing argument, the Assistant Commonwealth's Attorney, among other statements of somewhat similar character, said:

"I represent you and the rest of the citizens in this community; and if I didn't do a good job, you are not getting your money's worth.  There is my interest; but as to this man, I have never seen him before today.  He is just another murderer to me.  As members of the community and members of the jury, you will set the standard of conduct in this community.

"If we are going to live like animals in the jungle to let these people kill and kill with impunity—

"Mr. Merrill:  May it please the Court I object to that argument of the Commonwealth's Attorney and, moreover, request the Court to instruct the jury to disregard it.

"The Court:  I will clarify it.  The argument, if it is applied to asking the jury to convict contrary to the weight of the evidence in the case, is improper.  The argument, if assuming that the jury finds the evidence sufficient to convict, that the offense is not to be treated lightly and argument is proper.

"Mr. Merrill: Certainly, Your Honor; but to refer to living in jungles and so on is not proper argument.

"The Court: We can well eliminate the word 'jungle.' That isn't a very good word.

"Mr. Ward: I will leave the 'jungle' out, Your Honor."

It will be observed that this argument was objected to and motion made that the jury be directed to disregard it, but a mistrial was not asked for.

We have repeatedly said that it is the duty of the Commonwealth's Attorney to see that the accused is accorded a fair trial. In doing so, he should refrain from observations or remarks that evince feeling and prejudice, or that are irrelevant and derogatory to the witness. During his examination of witnesses, and in his argument, he should not resort to appeals to sympathy, passion or prejudice. *Harrison* v. *Commonwealth*, 183 Va. 394, 32 S. E. (2d) 136; *Dingus* v. *Commonwealth*, 153 Va. 846, 149 S. E. 414; *McReynolds* v. *Commonwealth*, 177 Va. 933, 15 S. E. (2d) 70; *Taylor* v. *Commonwealth*, 180 Va. 413, 23 S. E. (2d) 139; *Jackson* v. *Commonwealth*, 193 Va. 664, 70 S. E. (2d) 322.

The observations made by the Assistant Commonwealth's Attorney in his examination of the accused were improper, as was his reference in argument to "animals in the jungle." His repeated transgressions might well have been dealt with in a more emphatic manner than was employed. Yet from all the facts and circumstances, we do not think that the improper remarks and argument, dealt with as these were by the court, were prejudicial to accused. We hold that there was no reversible error committed by the court in its rulings in this respect. *Trout* v. *Commonwealth*, 167 Va. 511, 188 S. E. 219; *Jackson* v. *Commonwealth*, *supra*.

Other assignments of error were taken, but as it is not likely that these questions will arise at the next trial, they are not discussed.

*Reversed and remanded.*