# Richmond

## John Henry McCann v. The Commonwealth.

October 9, 1939.

Record No. 2167.

Present, All the Justices.

430

432

■■■■■■■■■■

*James G. Martin & Son,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Walter E. Rogers, Special Assistant,* for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

Plaintiff in error, John Henry McCann, was tried by a jury upon an indictment charging him with an attempt to rape Jean Walker, an infant under the age of eight years. He was found guilty and his punishment fixed at death. In accordance with the verdict of the jury, the trial court sentenced him to be electrocuted as provided by statute.

The case presented by the Commonwealth is as follows: On the 13th day of February, 1939, between six and six-thirty, P. M., Jean Walker, the victim of the attack, and a younger girl were playing on the front steps of a church in the vicinity of Jean Walker's home, when they were accosted by the accused with whom they were unacquainted. He asked them if they wanted a dollar. They answered in the affirmative and he directed them to go to a vacant house three doors away and get some coal, which he said was there. Jean went to the house, looked in an open window, and not seeing any coal, came back and reported that fact to accused. Thereupon, the accused stated, "That's the house right here." Then the accused took the two children to the vacant house and proceeded down a lane adjacent to the house and stopped in front of a broken window frame. He lifted the children through the broken window frame into the first floor of the house, and not finding any coal, he then directed the children to go upstairs to the second floor. When the trio reached a room on the second floor of the house, accused commanded the companion of Jean to stand in a corner. He then told Jean to pull down her pants, pull up her dress and lie on the floor with her legs as wide open as she could get them.

Accused then took off his coat, unbuttoned his pants and got on top of the child, after striking a match and looking at her vagina. He then asked her, "Has this ever happened to you?" She said, "No." He then put his hand between her legs. Jean then told accused she did not want any money, that she wanted to go home. Thereupon, accused began to choke her,. stuck a knife under her chin and told her to be quiet. He then said, "If you don't shut up I'll kill you so you'll never see your mamma and daddy again." At this juncture, H. M. Humphries (whose evidence will hereafter be referred to) appeared on the scene and ordered accused to, "Stand where you are." Instead of obeying this command, accused arose, ran to the window and jumped out, just as Humphries fired at him two shots from a pistol.

H. M. Humphries, a witness for the Commonwealth, testified: On Monday, the 13th day of February, 1939, at "about" 6:15 P. M., he was working on an automobile near his residence situated at 945 Sheldon avenue, when a lady (Mrs. Linman) accosted him and inquired, "Did you see a colored fellow go by with a couple of children and go up side this vacant house?" He answered in the negative, and she said: "Well he went up side this vacant house—he's up to something." He went in his house, procured a pistol and went to the side of the vacant house but did not hear voices. He entered the house and crept up the stairs to the second floor, and when he reached the room he saw the form of a man on all fours. He did not shoot as he knew the children were in the room, but commanded the man to stay where he was, telling him that he had him "covered." The man "made a leap like a frog" through the doorway and he fired at him twice as he passed out of the room. He then saw the two children in the room, and Jean was frightened and asked him not to kill her. He told her, "I'm not after you, I'm after the man." The children, he said, left the house ahead of him, and it was too dark in the house to note the condition of Jean's dress.

Mrs. L. N. Linman, a witness for the Commonwealth, testified that she lived at 951 Sheldon avenue near the home of Jean Walker with whom she was acquainted; that on February 13th, 1939, she had been listening to her radio; that she turned off the radio at 6:15 P. M. and walked to her front door; that she saw Jean Walker and another child playing on the steps of the church; that she saw a colored man approach the children, speak to them and then make a motion as if to leave them; that he then retraced his steps and the children started down the street; that the man motioned to the children; that they entered a lane at the vacant house; that she had a "surmise" and started to follow the man; that on the way she met a man and told him she had seen a colored man going with two children across the street and asked him to follow her, which he did; that she entered the lane and walked back to the rear of the vacant house; that she listened to ascertain if the children were in the house; that she heard "Jean Walker pitifully pleading with the man to allow her to go home to her mother," that she then notified Humphries that the children were in the house; that he entered the house and she heard him speak to the man and tell him not to move, that he had him covered; that she heard a shot and a man, at a distance of an arm's length from her, jumped from the second story of the house; that the man who jumped out of the window was minus a coat and had a kinky head; that she went to the front of the house and met the children coming out.

It was further shown by the evidence adduced by the Commonwealth that a letter was found in a pocket of the coat left in the house by the assailant of Jean Walker, addressed to "John H. McCann".

It was also shown that Jean Walker, both before and at the trial, positively identified the accused as her assailant.

The Commonwealth also proved by Mrs. Dorothy Walker that when she arrived home at approximately 6:30 P. M., her daughter Jean was "nervous and awfully upset" and told her "just what had happened to her."

The accused, testifying as a witness in his own behalf, stated that he asked Jean Walker to go to the vacant house; that he had no desire to harm her; that he had recently been released from the Massachusetts penitentiary, after serving a sentence upon a charge of attempted rape; that he took the girls to the house for the reason that he just wanted to "look at them in a practical way" and see if a grown man could penetrate a child; that he did not unbutton his pants, but did tell Jean to lie down on his coat, and to take off her pants and open her legs; that he got down on all fours and struck a match and looked at her; that he did not intend any more than to look at her.

The accused was defended by eminent counsel who concedes that the evidence is sufficient to warrant a verdict finding the accused guilty of the offense charged in the indictment.

It is assigned as error that the court erred "in overruling the motion to quash the indictment."

The basis of this contention is that the indictment shows upon its face that it "is scratched up and altered"; that "the Commonwealth made no explanation, and put on no evidence to show whether the alteration had been made before or after it was returned by the grand jury as a true bill." There is no merit in this assignment of error.

The original indictment is filed as an exhibit in the case and shows that it was drawn on paper containing a printed form originally designed for use as an information. This form was merely altered to conform to a proper form of an indictment and the blanks filled in with typewritten matter which conclusively demonstrates the charge against the accused.

In *Mawyer* v. *Commonwealth*, 140 Va. 566, 125 S. E. 317, a similar question was presented to the court and was disposed of in this language: "If there can be any fair doubt as to the conclusion just stated the blank counts should be treated as surplusage. Unnecessary and redundant alterations never violate pleadings, and when the crime is other-

wise sufficiently, charged, redundancy is rejected as surplusage."

If there was any doubt about the matter, it is dispelled by section 4875 of the Code, which reads *inter alia*: "No indictment or other accusation shall be quashed or declared invalid for the omission or insertion of any other words of mere form or surplusage."

The second assignment of error is as follows: "In overruling the objection of defendant to the testimony of the mother of the child as to the report told the mother by the child identifying defendant and saying what he had done to her."

This contention rests upon Bill of Exception No. 2, which reads thus:

"Be It Remembered, that on the trial of this case, during the taking of the evidence, as set forth in bill of exceptions, No. 1, to which reference is made as if fully copied herein, and during the taking of the testimony of the witness Mrs. Dorothy Walker, called on behalf of the Commonwealth, the defendant by counsel duly objected and excepted to that part of her evidence as shown by the following transcript, to wit:

"By Mr. Arnold:

"Q. Mrs. Walker, you said, I believe, it was 6:30 when your little daughter reported something to you?

"A. Yes, sir.

"Q. I will ask you to tell the jury what she reported.

"Mr. Martin: I submit that's hearsay.

"The Court: What was the question? Repeat the question.

"Mr. Arnold: I asked her to tell the jury what complaint her little child made to her.

"The Court (addressing the witness): You can testify that a complaint was made, but the particulars of the complaint cannot be proved. You can testify that your child,

if in fact it did, made a complaint, but the particulars of that complaint cannot be related.

"Mr. Arnold: Your Honor rules she can't say she complained of what?

"The Court: She can't repeat the language.

"Mr. Arnold: But that she complained—

"The Court: In general terms she can say the complaint was made. The language which the court used is that the particulars of the complaint cannot be proved.

"Mr. Martin: And I am saving the point on any report made, may it please the Court.

"By Mr. Arnold:

"Q. Mrs. Walker, I don't want you to say what your little child said to you. I do want you to tell just what she complained of happening, if anything happened to her.

"A. Well, when I saw her it was fifteen minutes after it happened.

"Q. What was her physical condition?

"A. Nervous and awfully upset; and she told me just what had happened to her.

"Q. What did she say had happened to her? Had somebody taken anything away from her, or done something to her?

"A. Well, she said this colored man had taken her in a house, and what he had tried to do she told me.

"Mr. Martin: We object to any more than that.

"The Court: That's all."

In the petition for a writ of error it is said:

"The trial court permitted the recitation of the child to its mother some fifteen minutes after the act, under two theories, to-wit: as part of the *res gestae*; and as a recent complaint of rape after the fact."

Counsel, in our opinion, is in error as to the time between the commission of the act and the statement made to the mother. The witness Humphries testified that it was *about* 6:15 P. M. when he went with a lady (Mrs. Linman) to the vacant house. Mrs. Linman positively fixed the time when

she turned off the radio at 6:15 P. M. What followed this act of turning off the radio has been set forth, *supra*. Mrs. Walker fixed the time of Jean's return home at "about 6:30 P. M."

The time between the inception and the consummation of the attack has been fixed by the verdict of the jury on the basis of the only evidence submitted to them on the question of time. If the whole occurrence took place between 6:15 P. M. and 6:30 P. M., then the recital of Jean Walker could not have occurred fifteen minutes after the act complained of.

The question then arises, was the statement of Jean Walker a part of the *res gestae* or was it in the nature of a recent complaint? In our opinion, the statement falls squarely within the rule applicable to the doctrine of *res gestae*. That the statement was made—not in fifteen minutes after the occurrence, but in a very few minutes thereafter—has been demonstrated. That it was made by a frightened, nervous child of less than eight years of age, who could not possibly have fabricated such a story, must be conceded. In fact, there was no reason to fabricate a story upon which to base a conviction, for the reason that the circumstantial evidence, together with the positive evidence of Humphries and Mrs. Linman point unerringly to the guilt of the accused.

In Wharton's Criminal Evidence, section 262, the author says: "*Res gestae* are events speaking for themselves through the instinctive words and acts of the participants—not the words and acts of participants when narrating the events. What is done or said by participants under immediate spur of a transaction, becomes thus part of the transaction, because it is then the transaction that thus speaks."

In *Hill's Case* (*Hill* v. *Com.*), 2 Gratt. (43 Va.) 594, the court had under consideration a similar question to the one under review. After citing the case of *Rex* v. *Foster*, 25 Eng. C. L. R. 421, the court laid down this rule: "All that is necessary, according to these cases, to make the declara-

tion part of the *res gestae*, is that it should be made recently after receiving the injury and before he had time to make up a story or devise anything for his own advantage. Tested by this rule, the statement referred to is clearly admissible."

In *Kirby* v. *Commonwealth,* 77 Va. 681, 689, 46 Am. Rep. 747, Lewis, P., speaking for the court, said:

"In cases like the present it is essential to the admissibility of the declarations of the injured party as part of the *res gestae* that they be made recently after the injury, and before sufficient time has elapsed for the fabrication of a story. If made after such time has elapsed, and after the *lis mota* may be supposed to exist, they are no part of the *res gestae*, but are merely narrative of a past occurrence or hearsay, and are not admissible as evidence. Applying this test to the present case, it is plain that the prisoner's first exception is not well taken.

"Here, the declarations in question were not only made recently, but probably within two minutes, after the shot was fired. And this, taken in connection with the declarant's condition, mental and physical, produced by the unexpected, unprovoked, and, as he supposed, fatal shot through the head, repels the idea that his declarations were fabricated. Indeed, under the circumstances disclosed by the record, it is hardly reasonable to suppose that they could have been fabricated, as both the time and capacity for reflection were wanting. *Hill's Case,* 2 Gratt. (43 Va.) 594. Nor is there anything decided in *Haynes' Case,* 28 Gratt. (69 Va.) 942, relied on by counsel for the prisoner, inconsistent with these views. That was a prosecution for larceny, and it was there held that the declarations of the prosecutor, made soon after the discovery of the larceny and after he had gone to the house of a neighbor, were not admissible. The case in its nature and circumstances so widely differs from the present case that further reference to it need not be made."

In *Huffman* v. *Commonwealth,* 168 Va. 668, 681, 190 S. E. 265, 271, Mr. Justice Gregory said:

"Whether a statement is a part of the *res gestae* depends on the circumstances of each case, and there is no fixed rule by which it can be decided. Statements of the victim made a short time after he has been mortally wounded which obviously have not been concocted or premeditated charging the defendant with the act are a part of the *res gestae*.

■ "Whether or not a statement is a part of the *res gestae* rests within the sound judicial discretion and judgment of the trial court. Such discretion and judgment, of course, may be the subject of review; but in doubtful cases there ought to be and is a presumption in favor of the action of the court below. See Digest of Virginia and West Virginia Reports (Michie), Vol. 8, page 664, and cases cited."

There is no merit in this assignment of error.

The next assignment of error is that the court erred: "In refusing to direct a mistrial because of improper argument of the regular assistant Commonwealth's attorney."

In his opening address to the jury, the assistant attorney for the Commonwealth said:

"Gentlemen I am not going to impose upon your time, or either on your patience by showing you a mental picture of your own daughters or granddaughters in the place of this little girl, Jean Walker."

The learned counsel for the accused asked for a mistrial, whereupon the trial court instructed the jury as follows:

"I think this language is very ill chosen and I want to instruct you gentlemen to disregard it absolutely, and I am going to ask the Sergeant to poll the jury and see if they will disregard it and decide the case as if that remark had not been made."

The Sergeant then polled the jury and each juror answered that he would disregard the remark. As an added precaution the trial court, upon the conclusion of the arguments in the case, again instructed the jury as follows:

"Gentlemen I want to instruct you further. The attorney for the defendant objects to the remark of the Assistant Commonwealth's Attorney as he began his argument to you. If his remark can be construed as asking you to make a per-

sonal application in this case I want to tell you not to do it. The instructions which the court has given you embody the law. The court instructed the jury that 'It is the duty of the jury to weigh the evidence in this case cautiously and without prejudice or passion.' If you are to give the evidence in this case a personal application then you could not carry out the instructions as given to you. But instead of giving it a personal construction you must view it absolutely impersonally. You are trying the case of the Commonwealth against John Henry McCann for an attempted rape on Jean Walker. If possible you should regard the evidence as a charge of 'A' of an attempted rape on 'B' so far removed should your consideration be from any personal feeling. You are sworn to try this case without prejudice and without passion, and notwithstanding what the Assistant Commonwealth Attorney said to you—which I am sure was inadvertent—I want to say to you not to do as he suggested—perhaps suggested—in his remarks, but decide this case absolutely on an impersonal basis."

The record shows that when the jurors were examined on their *voir dire,* counsel for the accused propounded to each one this inquiry:

"Gentlemen would you all give a fair trial to a colored man charged with an attempted rape on a little white girl, without any passion or feeling against him—give a fair trial according to the instructions of the court without any feeling against him." Each of the jurors answered in the affirmative.

This court has so frequently dealt with assignments of error based upon the ill-advised arguments of counsel representing the Commonwealth in criminal cases, that it does seem that the injunction of the court should be obeyed, and thus relieve the court of constant reiteration. However, an examination of the decisions of this court shows an unbroken line denoting the demarkation between those cases where the violation of section 4778 of the Code was involved and those cases involving merely improper remarks of counsel addressed to the jury.

The cases of *Wilson* v. *Commonwealth*, 157 Va. 962, 162 S. E. 15; *Roller* v. *Commonwealth*, 161 Va. 1104, 172 S. E. 242; and *Elliott* v. *Commonwealth*, 172 Va. 595, 1 S. E. (2d) 273, relied upon by counsel for the accused deal with violations of sections 6211 and 4778 of the Code and are not in point.

On the other hand, this court has refused to hold improper argument to be reversible error, when the statute was not involved, where it appears that the trial court properly instructed the jury regarding the improper remarks of counsel.

In *Trout* v. *Commonwealth*, 167 Va. 511, 522, 188 S. E. 219, the doctrine announced in the cases of *Harris* v. *Commonwealth*, 133 Va. 700, 112 S. E. 753; *Seay* v. *Commonwealth*, 135 Va. 737, 115 S. E. 574; and *Funk* v. *Commonwealth*, 163 Va. 1014, 175 S. E. 861, was affirmed. In the opinion delivered by Mr. Justice Spratley this is said [167 Va. 511, 188 S. E. 224]:

"The question here presented is not new to this court. It seems to be an elementary principle that improper remarks of counsel, when withdrawn by instructions of the court, are not sufficient grounds for a reversal unless it plainly appears that the jury has been prejudiced against the accused thereby. We have repeatedly held that the granting, or refusal of a new trial on such grounds, is a matter within the sound discretion of the trial court, and that such discretion will not be interfered with except when abused."

This assignment of error is without merit.

The next assignment of error challenges the action of the court in refusing to arrest the judgment because the indictment was faulty. What was said relative to the first assignment of error applies to this assignment and it, therefore, is without merit.

It is next assigned as error that the court erred: "In refusing to grant a new trial because white ladies and children had been allowed before the jury to the prejudice of defendant having a fair trial."

In support of this assignment, the following affidavit of the accused was filed:

"I, John Henry McCann, make oath, that on my trial in said Court on March 15, 1939, while the jurors were being selected, and till after the jury was sworn and the spectators excluded, there were present in Court, inside the bar, within clear view of the jurors, about three, four or five little white girls of the apparent ages of from five to ten years old, in the apparent custody of white ladies, but which white girls and ladies did not testify in the case. And I believe, and aver, that some of these white girls or ladies returned into Court and heard the argument of counsel.

"At the time of said trial, there were, and are, four more charges of attempted rape on little white girls pending against me, who am a negro man, and said trial was on the charge of attempted rape on a little white girl.

"The unusual presence of so many little white girls in Court with their lady attendants was very noticeable.

"There had been much newspaper publicity in Norfolk City before my trial as to my alleged attempted rape on five little white girls on different occasions. I believe, and aver, that these other little white girls, who had no connection with my said trial, nor with any trial on the same day, were brought to Court on the day of my trial by direction of someone connected with my prosecution.

"I believe, and aver, that the presence of these little white girls and the ladies with them, had a detrimental effect upon my case, tended to prejudice the jurors against me, and tended to prevent my getting a fair trial. All the jurors and venire were white men."

A counter affidavit was filed on behalf of the Commonwealth and reads thus:

"This day personally appeared before me, W. L. Prieur, Jr., Clerk of the Corporation Court in and for the City of Norfolk, State of Virginia, John M. Arnold, who being, by me, first duly sworn deposes and says:

"That he was present at all times during the trial of John Henry McCann, charged with attempted rape upon

Jean Walker and is thoroughly familiar with all the surrounding circumstances and details.

"There were three girls, children, and their mothers in the Courtroom. They were brought there by persons interested in the prosecution as suggested in the defendant's affidavit. The children and mothers were material witnesses who were recognized on Grand Jury day for their appearance in Court, as witnesses on the trial day. They, when Court opened, were seated inside of a railing across the courtroom in the front row of chairs commonly used by veniremen, witnesses, spectators and members of the bar. They were all excluded along with all the witnesses in the case, on motion of defense counsel, and remained out of the Courtroom throughout the trial, except the little girl, prosecuting witness, and her mother, who came in to testify when called. None of the other ladies or children, including the second little girl who was present when the act was committed thereby being an eyewitness, were called. At no time did any of them conduct themselves in any manner calculated to attract attention, and if they returned to the courtroom, when spectators, who had been excluded by order of the court, were admitted during the argument by counsel, it certainly was not noticeable, I do not recall that they did and the defendant in his affidavit only claims so by way of belief or averment.

"It is true that other charges of a similar nature are pending against the accused but such fact was no part of this trial.

"Newspaper articles referred to in the affidavit, were nothing more than ordinary news articles, in fact nothing pertaining to this case or trial referred to in the affidavit justified or caused counsel for accused to bring same to the attention of the Court."

Section 4906 of the Code provides that:

"In the trial of all criminal cases, whether the same be felony or misdemeanor cases, the court may, in its discretion, exclude from the trial any or all persons whose presence is not deemed necessary."

That the presence of the three girls and their mothers was apparent to all who cared to observe, seems plainly inferable.

It is to be noted that counsel for the accused did not avail himself of the provisions of section 4906. Bill of Exceptions No. 4, is most illuminating and is a complete answer to the contention of the accused. In the Bill of Exceptions this statement is made by the trial court:

"The Court has no knowledge of the circumstances set out in the affidavit of John Henry McCann, the accused, and the counter-affidavit of Mr. John M. Arnold, the Attorney for the Commonwealth.

"If there were children in the Courtroom while the preliminaries of the trial were being conducted the fact was not brought to the attention of the Court, no request that they leave was made and no exception to their presence was taken by the accused.

"All spectators were excluded from the Courtroom during the taking of testimony. After the testimony had been concluded and during the argument of counsel a few of the persons who had been previously excluded returned to the Courtroom, but the Court has no knowledge whether the children referred to were among those or not; and on his motion for a new trial, as one ground therefor, the defendant claimed for the first time that these children and their mothers were detrimental to him and prevented him from having a fair trial, but the Court overruled this motion and the defendant duly excepted."

There is no merit to this assignment of error.

The next assignment of error alleges that the trial court erred: "in refusing to grant a new trial because the court had misled the jury as to their right to recommend that on a verdict for life imprisonment no pardon be granted."

The incident on which this assignment of error is based is thus shown by the record:

"After the jury had retired from the courtroom and had considered the evidence for some time, they returned to the courtroom and asked the following question:

"Your Honor, we want to ask if a verdict should be brought in for life imprisonment, could we put a clause in that no pardon be given?

"The Court: No; that will not be a part of your verdict. You either find him guilty or not guilty and fix the punishment as you choose. Of course you can make any recommendation that you might desire, but it will not be a part of the verdict and will not be recorded as such.

"By a Juror: But we still could make that recommendation?

"The Court: You still could make that recommendation, but it will not be a part of your verdict. Write your verdict first, and then, if you desire, as a jury to make any recommendation, that will go along with the papers as a part of your action, but it will not be recorded as a part of the verdict."

 No exception was taken to the action of the court, and under the provisions of Rule 22, this assignment will not be considered. Suffice it to say, however, that if this assignment could be considered, in our opinion it is ruled by the case of *Coward* v. *Commonwealth*, 164 Va. 639, 178 S. E. 797. In that case it appears that the jury enquired of the court what time the accused would get off for good behavior while serving a jail sentence. The court answered the enquiry by reading to the jury the statute in regard to "time off."

In delivering the opinion of the court, Mr. Justice Holt said:

"The jurors should have been told that it was their duty, if they found the accused guilty, to impose such sentence as seemed to them to be just. What might afterwards occur was no concern of theirs."

 See also, *Howell* v. *State*, 102 Ohio St. 411, 131 N. E. 706, 17 A. L. R. pages 1110, 1156, where it is said:

"In the absence of statute, it is the prevailing rule that a jury has no right or authority to accompany a recommendation of mercy with a verdict of guilty, their province

being solely to determine the guilt or innocence of the accused."

There is in Virginia no statute permitting such action by the jury.

■ The assignment of error is without merit.

The last assignment of error is as follows:

"In refusing to grant a new trial because the penalty, death, was excessive for this sort of attempted rape."

Section 4767 of the Code provides that for an attempt to commit rape (of the character charged in the indictment in the instant case) the punishment is death or in the discretion of the jury confinement in the penitentiary for life or for any term not less than three years.

■ It is an established rule in this jurisdiction that when the punishment ascertained by the jury is within the limitations fixed by the statute governing the crime charged in the indictment, this court will not interfere with a judgment carrying into effect the verdict of the jury.

Section 4767 of the Code was construed by this court in *Hart* v. *Commonwealth*, 131 Va. 726, 109 S. E. 582. That was a case of attempted rape and the punishment imposed upon the accused was the death penalty. In delivering the opinion of the court, Judge Sims said:

"It is a matter of history of the State, and of common knowledge among its people, that the crime of attempted rape is well nigh, if not altogether, as heinous as the consummated offense of rape. It is well known that public indignation is as much aroused by the one offense as the other, where the full accomplishment of the criminal purpose is thwarted only by some extraneous circumstance. And the almost universal repugnance which exists in the public mind to the making of the degree of the crime depend upon whether there has been an actual penetration or merely an attempted penetration, and the general aversion to the putting of the prosecutrix through the indecent and harrowing ordeal of having to testify in court upon such a subject, are well known. The likelihood of the resort to lynch law, unless there is a prompt conviction and a severe penalty

imposed, and thus a resultant grave shock to the peace and dignity of the Commonwealth is well known to exist, almost if not quite equally, in the case of an attempted, as of a consummated rape. These are considerations which the legislature properly could, and which, therefore, we must conclude the legislature did take into account as an element of the measure of the punishment in enacting the statute under consideration and fully justified the severity of the extreme penalty allowed by the statute to be imposed, * * *."

In our opinion, the crime committed by the accused is devoid of extenuating circumstances. But for the prompt action of Mrs. Linman in requesting assistance for the children and the courage exhibited by Humphries in rendering assistance, we have no doubt what the fate of little Jean Walker would have been on that occasion.

The judgment of the trial court is plainly right and same will be affirmed.

*Affirmed.*