# 𝔚𝔶𝔱𝔥𝔢𝔟𝔦𝔩𝔩𝔢

BRAD McREYNOLDS v. COMMONWEALTH OF ₁VIRGINIA.

June 9, 1941.

Record No. 2415.

Present, All the Justices.

936

*M. M. Long* and *Burns & Lively,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Edwin H. Gibson, Assistant Attorney-General,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

Brad McReynolds was a constable in Russell county. On May 18, 1940, in the town of Cleveland there he shot and killed Foy Dotson, was indicted for murder, has been convicted of voluntary manslaughter and sentenced to five years' confinement in the State penitentiary.

The killing was in the early part of the night. Foy Dotson, in his car, driven by Carlyle Owens, rode into town. It came to rest near the post-office. With them was an unidentified woman. The evidence for the Commonwealth is that these people were not boisterous, not drunk and not disorderly. The evidence for McReynolds is that they were drunk, were boisterous and were disorderly, and that because of this Stacy Grizzle, a brother-in-law of McReynolds, sent his young son to the home of Bill Sykes, a deputy sheriff, with the request that he come up and quell that disorder. McReynolds, who was a constable, chanced to be in the Sykes home, and in response to young Grizzle's message both of these men went uptown.

According to their testimony, they found Dotson sitting in his car drunk, and, according to the Commonwealth's evidence, without more, Sykes "jerked" him

out of it and told him that he would have to search him and to put up his hands. Dotson made no objections but did as he was told, and on him no weapons and no whiskey were found. McReynolds then said: "You've got to go to jail, buddy." Dotson asked him if he had a warrant, to which McReynolds answered: "I don't need one." Thereupon these officers started off with Dotson to jail. The situation then was this: Dotson was unarmed and the officers knew it. Certainly he was sober enough to talk intelligently and to walk away. He did not have to be carried. McReynolds tells us that they had gone but "a few feet" when trouble began, for which he claims Shoffner Dotson was primarily responsible. Shoffner Dotson is a brother of Foy. He said that as these officers walked off with his brother McReynolds held him by the right arm and Sykes by his left. He asked Sykes: "What has he done?" Sykes, by way of answer, "turned around and started to feel over me and said: 'You son-of-a-bitch, you have got nothing to do with that,' and when he said that I hit him," and knocked him over on the walk. Sykes came back with gun in hand, punched him (Shoffner) in the side and said: "If you bat a damned eye I will lay you there with your brother." It was after Sykes was struck but before this threat that Foy was shot.

It is further in evidence for the Commonwealth that when Foy was shot he had his hands up and was offering no resistance, and that both he and McReynolds were standing up and not struggling on the ground. From the defendant's evidence, and particularly from the testimony of Sykes, it appears that Foy, when these officers walked away with him, manifested some reluctance and was pulling back, as men taken to jail often do; but that was all. It was then that Shoffner hit Sykes with his fist in the back of his head, grabbed him and pulled him away from his brother, and it was in this struggle that Sykes succeeded in getting his pistol loose and punched Shoffner in the stomach with it. It was "about the time

I got him loose from the gun and punched him with it that I heard a shot." Occupied as he was, he saw nothing of what was taking place between Foy and McReynolds immediately preceding the homicide. When he first saw McReynolds he was sitting on the ground and trying to get up; there was blood on his mouth, and this was the situation when Sheriff Combs came up.

McReynolds in substance said that he was "addled" from Foy's assault, was in terror for his life and shot to save it. He was at Sykes' home when his nephew came and told him: "Uncle Brad, Foy Dotson is over here drunk and raising sand." He went over and found "Dotson was sitting with the car door open, half open and the glass was rolled down in the door of the car, and his arm was up in the glass you know, and his head was laying on his arm, * * * ."

Foy was arrested for being drunk and was searched. The party started off to jail and after they had gone a few feet Shoffner came up and struck Sykes with his fist on the back of his head, knocking him down. According to McReynolds' evidence, Foy knocked him down at about the same time, "straddled him," attempted to strike him again with one hand and to search him with the other. He further said that he thought Foy was looking for his gun and would kill him if he found it. He prevented Foy from striking him again by holding his arm up and while holding his arm up he got his pistol out, "put it close against the flesh and fired." The bullet itself entered the right side at the armpit and came out at the left.

This evidence supports the verdict. We do not mean to say that a jury would necessarily have had to reach a different conclusion had it accepted McReynolds account of what occurred. Whether or not the situation was such as to put him in fear for his life is a jury question, and as to it we express no opinion.

Objection was made to the admission of certain testimony.

"The honorable trial court erred in permitting Carlyle Owens, a witness for the Commonwealth, to relate certain detailed statements claimed to have been made by Shoffner Dotson, a brother of Foy Dotson, the deceased, to Bill Sykes, deputy sheriff, and to testify, over the objections of counsel for your petitioner, as to certain detailed occurrences said to have taken place between them after Foy Dotson was killed, and which were no part of the litigated act; all of which are shown at pages 104 to 107, inclusive, and being questions from 1 to 9, inclusive, propounded on the re-examination of the said Carlyle Owens, aforesaid."

Carlyle Owens, an eyewitness, was permitted to say that immediately after Sykes had subdued Shoffner he put handcuffs on him and hit him twice in the mouth. Shoffner asked that they be taken off that he might go to the aid of his brother, to which Sykes replied: "If he didn't shut up he would lay him by the side of his brother."

█ If we were to concede that this was error, it was harmless error and could not possibly have affected the jury's ultimate conclusion. Its verdict rested upon this fact, testified to by several witnesses: McReynolds and Foy were both standing up when Foy was shot, who, when shot, was doing nothing. Foy was shot when and because Shoffner had knocked Sykes down, all of which occurred in a moment of time.

█ We have times without number said that there was no such thing as a perfect trial—that an accused is entitled to one fair trial and to nothing more.

Sykes and McReynolds went into town for a common purpose—to quell a drunken disturbance. They both participated in the search of Foy and in his arrest, and both were taking him to jail when Sykes was knocked down. They were acting in concert and because of this concert the assault on him was made. All that thereafter occurred took but a moment's time.

█ All that is said and done by participants in a com-

mon enterprise during its immediate progress becomes a part of the transaction itself.

In the late case of *McCann* v. *Commonwealth*, 174 Va. 429, 4 S. E. (2d) 768, Chief Justice Campbell cited with approval this statement of the law from Wharton's Criminal Evidence, 10th Ed., section 262:

■ "*Res gestae* are events speaking for themselves through the instinctive words and acts of the participants—not the words and acts of participants when narrating the events. What is done or said by participants under immediate spur of a transaction, becomes thus part of the transaction, because it is then the transaction that thus speaks."

■ "Statements by a participant in a transaction are admissible as part of the *res gestae,* if spontaneous and made while under the influence of the transaction itself." *State* v. *Coram,* 116 W. Va. 492, 182 S. E. 83. Headnote by the court.

In a note to the section which we have quoted above from Wharton, it is said that a careful reading of case law shows a constant tendency to enlarge the rule governing the admission of evidence of this character; and in support of that statement is cited the practice of the Texas Court of Criminal Appeals, which is characterized as "unquestionably the ablest criminal court in the United States." That court, in considering this question, refuses to be bound by strict rules of law but looks to the whole record before coming to any conclusion.

■ The trial court is vested with wide discretion and its exercise of that discretion we should uphold unless it has been abused.

In *Huffman* v. *Commonwealth,* 168 Va. 668, 190 S. E. 265, Mr. Justice Gregory said:

■ "Whether or not a statement is a part of the *res gestae* rests within the sound judicial discretion and judgment of the trial court. Such discretion and judgment, of course, may be the subject of review; but in doubtful cases there ought to be and is a presumption

in favor of the action of the court below. See Digest of Virginia and West Virginia Reports (Michie), Vol. 8, page 664, and cases cited.''

In *Provident Life & Accident Ins. Co.* v. *Eaton,* 84 F. (2d) 528, a Virginia case, this quotation from *Commonwealth* v. *McPike,* 3 Cush. (57 Mass.) 181, 50 Am. Dec. 727, is cited with approval:

''In the admission of testimony of this character, much must be left to the exercise of the sound discretion of the presiding judge.''

''The question as to whether a statement is a part of the *res gestae* depends on the circumstances of each case, * * * ''. *Standard Oil Co.* v. *Neville,* 48 F. (2d) 580.

This is in substance what we held in *Huffman* v. *Commonwealth, supra.*

In the light of these widely recognized rules, we are of opinion that the discretion of the trial judge has not been abused.

All of this evidence is competent, and for another reason: When young Grizzle notified Sykes and McReynolds that there was a disturbance in town they started up to quell it. As to whether or not Foy had been drinking is in dispute. If he had been drunk and offensive in the presence of these officers, he might have been arrested without a warrant; certainly they had none. However that may be, Sykes roughly pulled Foy out of Foy's car, and he and McReynolds proceeded to search him, without avail, and then each holding him by an arm started off to jail, pulling him along. That these men engaged in a common enterprise and worked together for a common end is too plain for argument.

Objection is made to the Commonwealth's instruction No. 9, which reads:

''The court instructs the jury that on a trial for murder, the law of self-defense is the law of necessity, and the necessity relied upon to justify the killing must not arise out of the prisoner's own misconduct; and, if the jury shall believe from the evidence that the prisoner

by his own misconduct brought about the necessity of killing the deceased, should they believe there was such necessity, then the prisoner cannot justify the killing of the deceased by a plea of necessity, unless he was without fault in bringing about that necessity.''

We find nothing wrong with this instruction. If Mc-Reynolds brought about this tragedy by his own misconduct, the plea of self-defense cannot avail. That statement might be elaborated to cover other phases of other cases. For this in judgment, it is enough.

There is evidence in the record, offered on behalf of the Commonwealth, which tends to establish these facts and which a jury might have believed:

McReynolds had made threats as to what he would do should he have occasion again to arrest Foy. When he went into town he found Foy quietly sitting in Foy's car and perfectly sober. He was jerked out and searched, and on him they found neither weapon nor liquor; nor was anything suspicious found in the car itself. They had no warrant of arrest. Foy asked if they had such authority and was rudely told that it was not necessary. Thereupon, without more, they proceeded to drag Foy off to jail. If he resisted arrest and assaulted his captor, it was conduct brought about by the captor's misconduct. No felony had been charged and no misdemeanor had been committed in the presence of the officer.

It is not enough for the accused to say that he was terrified. There is no way by which we can gauge his state of mind. Moreover, one whose nerves were unstrung might have been frightened by facts which would not have troubled an ordinary man at all. It is for a jury to say whether they were reasonably sufficient to warrant an ordinary man in believing that he stood in danger of serious bodily harm. *Fortune* v. *Commonwealth,* 133 Va. 669, 112 S. E. 861; *Mercer* v. *Commonwealth,* 150 Va. 588, 142 S. E. 369.

In *Crosswhite* v. *Barnes,* 139 Va. 471, 124 S. E. 242, 40 A. L. R. 54, speaking through Judge Burks, it is said:

"The execution of a warrant of arrest for a past misdemeanor is not the exercise of a discretionary power, and an officer executing it can only claim the protection of the law when he himself is acting pursuant to law. His powers are well defined, and he should keep within them. So long as he does so, he is entitled to the fullest protection the law can afford, but the law affords no protection to an officer while violating a law he has sworn to support. Such is and has been the view taken by this court."

The principles there stated were restated in *Hendricks* v. *Commonwealth,* 163 Va. 1102, 178 S. E. 8, where it was said:

" 'Public officers duly equipped with the authority of the law represent the majesty of the law, and to them, when so equipped, every good and true citizen should yield prompt and willing obedience, and they should be accorded the fullest protection in the discharge of their duties. But "nothing can so militate against the efficient administration of justice and the proper regard for the law of the land as unlawful and reckless conduct on the part of officers who are charged with its enforcement." *Bourne* v. *Richardson,* 133 Va. 441, 113 S. E. 893.' *Crosswhite* v. *Barnes, supra.*"

In the motion to set aside the verdict these objections were made:

"(7) Because the court told the jury orally, before it retired to its room that it had no fault to find with the Commonwealth Attorney's argument on the question of self-defense.

"(8) Because the court gave a general charge to the jury orally, at the request of the Commonwealth Attorney, after the case had been fully argued by the Attorneys for the Commonwealth and defendant, and in which they used the written instructions previously given by the court before the argument began, as a basis for their argument of the law and facts of the case.

"(9) Because the court gave to the jury certain other

oral instructions after the jury had been instructed in writing, and after the arguments aforesaid had been completed, and the jury was preparing to go to its room to consider of its verdict.

"(10) Because the court gave to the jury, at the time aforesaid, certain other oral instructions which were contrary to law and in conflict with the written instructions as previously given by the court."

█ Conceding that this is ordinarily not good practice, they cannot be sustained for two reasons: Timely objection was not made and if any statement made by the court was not law, it was not pointed out.

Mr. Warren, who assisted in the prosecution, in the course of his argument said:

"I might say I would like to take you down to the little town of Cleveland, out in the outskirts, on a bank, where there is a weather-beaten cottage, with a porch that leans with age, the floor of which is decayed, and I would like to show you an old white-haired mother, who sits there and trembles with the palsy of age, and grieves for the loss of her boy. I would like to show that picture. Then I would like for the gentlemen to look at that picture and come back to you and say because Foy Dotson was a bootlegger, because he was guilty of a misdemeanor, because he went to St. Paul and got whisky from a store to which the State of Virginia invited him, and because he had not had the opportunity to be of high character, then you have to kill him.

"That is another picture. That is a picture from life's other side."

He then went on at some length to discuss other phases of the case, when counsel for the accused said: "We object to that argument." Just what he was objecting to we do not know.

Mr. Fuller, the Commonwealth's Attorney who closed the case, said:

"Mr. Long wanted to know whose house Mr. Warren was talking about yesterday. He asked that question in

his argument? I can answer it. It is the mother of Foy Dotson, who is seventy-eight years old, and who lives in a little, humble home over there.''

''By Judge Lively:

''We object to that argument as improper and prejudicial.

''By Mr. Fuller (continuing):

''Almost moss covered and thatched. She wanted to come to this trial, but she was not able.

''By Judge Lively:

''Same exception.

''By Mr. Fuller (continuing):

''Mr. Long tried to argue it wasn't the home of Foy Dotson, and Mr. Long asked whose it was, and I am telling you she wasn't able to come here, and go through this ordeal, but she is sitting in that humble home, seventy-eight years old, palsied, grieving about the boy that sleeps right up on the hill above the house.

''By Judge Lively:

''This is excepted to because immaterial, improper, and prejudicial to the defendant.

''By Mr. Fuller (continuing):

''You can go out there, and you will find out about that.''

All too often we have been called upon to deal with incidents like this. No conviction should rest upon an appeal to sympathy, passion or prejudice. If reason alone cannot be relied upon, it should be set aside. Sometimes where cognate statutes are involved transgressions of this kind cannot be corrected. Comment on the failure of a wife to testify against her husband in some criminal case is irremediable. *Wilson* v. *Commonwealth*, 157 Va. 962, 162 S. E. 15. Ordinarily intemperate observations of counsel for the Commonwealth can and should be corrected by the court. This matter and this distinction has been adequately and lucidly dealt with by Chief Justice Campbell in *McCann* v. *Commonwealth*, 174 Va. 429, 4 S. E. (2d) 768. Nothing is to be gained by restating

what has been there well stated. In the instant case no caution was given to the jury and so this improper appeal stood. It is controlled by *Parsons* v. *Commonwealth*, 138 Va. 764, 121 S. E. 68, and *Dingus* v. *Commonwealth*, 153 Va. 846, 149 S. E. 414.

Mothers before Niobe have grieved over their dead children, but an appeal by the Commonwealth to that emotion can have no proper place in a murder trial. A conviction rests secure only on reason. The jury should have been cautioned, but it was not. This assignment of error is well taken.

In the record is this stipulation:

"It is stipulated between attorneys for both parties that the foregoing stenographic report of testimony, and other incidents of the trial therein, shall be considered in lieu of formal bills of exceptions, and that all questions raised, all rulings thereupon, all exceptions thereto, and the grounds of such exceptions, respectively, as shown by said report of testimony, and other incidents of the trial therein, may be relied upon by either or both parties, in the Supreme Court of Appeals, without taking separate bills of exception as to each point raised and excepted to.

"This the 28 day of October, 1940.

"L. E. FULLER,
"Of Counsel for the Commonwealth,
"Or Commonwealth Attorney.
"BURNS & LIVELY,
"Of Counsel for the Defendant."

Counsel are left free in their assignments of error to select such incidents as they rely upon and upon this court falls the burden of searching the record for their verification.

There are other assignments, but upon those dealt with this case turns. They cannot affect it and so their detailed consideration is not necessary.

For the reasons stated this case is reversed and remanded.

*Reversed and remanded.*