# Richmond

ALBERT JACKSON, JR. v. COMMONWEALTH OF VIRGINIA.

April 21, 1952.

Record No. 3953.

Present, All the Justices.

The opinion states the case.

*Hill, Martin & Robinson* and *Gregory H. Swanson,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Frederick T. Gray, Assistant Attorney General,* for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

Albert Jackson, Jr., referred to herein as defendant, was indicted for the rape of Lena Houchens, tried by a jury, found guilty and his punishment fixed at death. He was sentenced accordingly and on this appeal he assigns these errors to the judgment: (1) That the evidence did not support the verdict; (2) that the defendant's confession was improperly admitted into evidence; and (3) that there was improper argument by the Commonwealth's attorney.

The assignment on the evidence requires that it be stated at length. The material evidence for the Commonwealth was as follows:

The prosecutrix, a white woman about 40 years old, the mother of three children, testified that at about eleven o'clock on the night of May 5, 1951, as she was going home from her work in a restaurant on Main street, in the city of Charlottesville, and as she reached the intersection of Main and Second streets, "* * this colored man was standing on the corner and he reached out and grabbed me;" that he had $5 in his hand which he offered her, saying she had to go with him. She said she

wasn't going anywhere, and thereupon he knocked her down; he had her by the hands; she tried to get loose and yelled for help, but he put his hand over her mouth, dragged her up Second street to the colored Elks' Home, dragged her on through the alley as she was "screaming and hollering;" that he raped her; that he had intercourse with her only once that she remembered because he knocked her out.

Main street at the point referred to runs approximately east and west. Second street, running approximately north and south, crosses it at right angles. The Elks' Home is on Second, about 125 feet north of Main, about the middle of the block. An alley on the south side of the Elks' Home leads off west from Second street and passes between the Home and the next building on the south into a vacant lot behind the Elks' Home.

Herbert Wilkins lives on this alley right behind the Elks' Home. That night at about ten minutes to eleven he saw back of the Elks' Home a man dragging a woman who was holloing and screaming. He heard her say, "* * You might kill me, but you ain't going to do anything." He listened ten or fifteen minutes but was unable to identify the couple. He saw the man have the woman over the fence choking her and she was struggling to get away. After he went back into the house he could still hear her holloing. The noise continued for about an hour, but disturbances of that kind were frequent in that area and he did not pay much attention to it.

At approximately 1:00 a. m., City Policeman Morris, on his beat, came toward Main street along Preston avenue, the next street west from Second street, and as he got opposite a parking lot beside the A & P store he heard a sound. He flashed his light over there and saw the defendant on top of the prosecutrix. The defendant came toward him saying, "Get out of my way," but he took him by the arm and the defendant said, "I propositioned this woman here," and he then heard the prosecutrix say, "Give me my $5.00," and defendant replied, "I ain't got any $5.00."

The prosecutrix did not appear to know what was going on. She was trying to get up but was unable to stand. When the officer tried to pick her up she fell out of his hands. Her head was on a pile of ice which had been thrown out by the store. Blood had run down through the ice and there was blood on a wine bottle nearby. She was covered with blood, "I mean solid, her face and her hair and there was some blood on her legs." Her shoes were off. One was later found at the mouth of the

alley and the other in the A & P lot. He asked her what had happened and she said the defendant had pushed her into the hole, pointing in the direction of a hole back in the parking lot. The defendant said he found her in the hole and had brought her down to where they were.

As the defendant got off the prosecutrix his pants were open in front and his person was exposed. The front of his pants was covered with a large spot of blood; there were blood stains on his hands and on his arms.

The officer secured a cab and took them both to the police station. The prosecutrix was taken from there to the hospital.

She was seen by Dr. Merritt in the emergency room at the hospital about three o'clock that night. She was then very groggy and her conversation was very incoherent. There were multiple abrasions and lacerations all over the body. She had a three-inch cut on her forehead; there were bruises and lacerations about her eyes, on her face, on her legs, particularly around the knees. She had been previously seen by the surgical and neuro-surgical services; glucose and blood transfusions had been given her. There was bleeding from the vaginal opening, the vagina was filled with blood clots. There was a laceration extending from the left lateral fornix over the posterior surface of the cervix to the right lateral fornix. The entire vaginal mucous was stripped off the posterior surface of the cervix and there was bleeding from the laceration.

The Chief of Police, J. E. Adams, saw defendant at the police station a little after one o'clock that night. The defendant then told him he was with a Witcher boy at the Elks' Home; that the two of them went north on Second, turned left on Market, and when in front of a service station he heard a noise; that he then walked through the parking lot, found the prosecutrix in the hole, helped her out and carried her through the parking lot to where Policeman Morris found them. He admitted he was on top of the prosecutrix when arrested and trying to have intercourse with her. Witcher was brought in and denied being with defendant, whereupon defendant said: "I will tell the truth. He wasn't with me, let him go."

The defendant then agreed to go down to the place and show the officers what happened. He took them to the hole in the parking lot, which was five or six feet deep, in which were some cinder blocks with blood on them. He then showed them the

course of their travel to the place of arrest. There were blood spots all along the way.

Next morning Adams asked defendant if he wanted to tell him more about what happened last night. Defendant replied that he had already told Mr. Mayo and Mr. Durham, had given them a written statement. Defendant then told Adams he would tell him what happened. He said he had grabbed the prosecutrix at the mouth of the alley on Second street, offered her $5 first, then dragged her back in the alley. He said he tried to have intercourse with her three times but succeeded only twice. The first time was in the grass back of the Elks' Home; the next was between the fence and a cinder block wall back of the Elks' Home. When he got up from that act the prosecutrix tried to get away and fell into the hole; that he helped her out and carried her to the place of arrest because she couldn't walk. At the places pointed out by the defendant there were knee prints and other impressions showing someone had been on the ground. From the end of the hard surface in the alley to the place of the first act there were marks in the dirt indicating that something had been dragged along.

Adams testified that it was 374 feet from the corner of Main and Second streets through the alley and by the way defendant described to the place where he was arrested. Defendant said he was with the prosecutrix about two hours. The city manager of Charlottesville was in the office and heard the conversation between Adams and the defendant. He did not remember all the details but testified that the defendant admitted attacking the prosecutrix three times.

Photographs taken that night and next day were introduced in evidence. They showed the prosecutrix on the ambulance ramp at the hospital and in the emergency room, her appearance and the condition of her clothing; the defendant with the large blood spot on his trousers and on his underwear; and the places on the ground referred to in the testimony.

C. O. Durham, plain clothes policeman, visited the scene of the trouble within less than an hour after defendant's arrest. He testified to finding blood over a wide area at the mouth of the alley at Second street and in the alley, and to finding one of prosecutrix's shoes at the edge of the Second street sidewalk where it joined the alley, with a trail from that point indicating scuffling or dragging. This shoe, and also the one found in the

parking lot 150 feet away, both identified as belonging to the prosecutrix, were laced oxfords, both still laced and tied.

Next morning Durham and Mayo, assistant chief of police, took Jackson to go over the scene with them. The defendant pointed out the places where he had had intercourse with the prosecutrix and Durham testified as to blood and marks on the ground at those places. Defendant told them that while they were at the place of the second act, between the fence and the cinder block wall, a policeman checking the beat threw a light back there but did not see them, so he decided to move to another place. The defendant told them that the prosecutrix tried to get away from him there and fell into the hole. They followed a trail of blood from that spot to a filling station lot, where the defendant's hat was found.

Later that morning, Sunday morning, Durham and Mayo took the defendant upstairs at the police station, told him he had told them things the night before they did not believe; that if he told them anything they wanted it to be true, because they had found a witness down there "that saw him manhandling the woman and with that he did give us a written statement." This was written out and signed by the defendant himself in the presence of Durham and Mayo. It was introduced into evidence over the objection of the defendant and is copied in the margin.[1] Durham asked defendant why he picked that particu-

---

[1] I Albert Jackson, Jr. After having a copy of a Warrent served on me telling me what I was Charged with Make the following statment without promise or threats. Last night I was drinking Pretty heavy, so while I was leaving the elkes home I meet a Lady Coming up second st. I I tryed to propeasition her. by hulling her into the Alley next to the elks. We had a scuffle I must have hit her because there were some Stains of blood where her head was laying. I had the Intercouse with her And was starting the second. I had told her I was going to give her $5.00 so I moved up between the Wall and fence. Thats When I saw an officer's flash lights, But he didn't see me. so I told her I was going to move back farther. she was in front of me going over the edge of the wall and she fell. I helped her from down in the hold And started Walking Around by the Parking lot. I had to Carry her across the lot. so I stopped At the little entrance behind the A & P. And was trying to finish my intercouse when the officer flashed his light on me. she must hadn't seen him At first because she asked me for her $5.00.

I didn't try to resist Aresst so the officer Called A Patrol Car. And Carried me to the station.

Albert Jackson

At first I told all kinds of story's because I was Mixed all up. so the took me back to the scene. so now I write this Honestly.

The Above statement was Written By me Albert Jackson Jr. in the Presents of Mr Mayo an Mr Durham City Police.

Albert Jackson Jr.

lar woman and the defendant replied that he came out of the Elks' Home, was drinking and that was the first woman he saw.

The following is the substance of the evidence offered by the defendant:

The defendant testified that he was 23 years old; that on the morning of May 5 he started drinking around nine o'clock and drank most of a pint that morning; that he did some drinking with a few people he knew during lunch hour; that a little before six o'clock he got permission from the manager of the barber shop where he worked to go to the liquor store to get another pint; that he was drinking and riding around that night; that he remembered going out of the Elks' Home and meeting a woman; he did not know who she was; that he tried to make a proposition, "something about a $5.00 proposition," he did not know exactly what for; he did not know what he said to her and did not remember anything that happened after that until he was arrested, and he did not know why he was arrested. He said he had been drinking since 1945 and had a craving for drink.

He introduced as a witness Dr. Brick, psychiatrist of the Virginia penitentiary, who examined him on April 3, 1948. That was after his admission to the penitentiary under a ten-year sentence for felony imposed February 17, 1948. Dr. Brick's report of his examination was introduced into evidence and he read from it a paragraph beginning with the statement that "This is a congenial, immature, startled, subdued, rationalizing individual who became aggressive after separation from military service," and concluding with the sentence: "Considering the above, a prediction as to his adjustment cannot be made." The defendant was paroled from the penitentiary on August 28, 1950, under the supervision of a parole officer, who was also called as a witness by the defendant and testified to the defendant's interest in entering a trade school in Baltimore and introduced letters written by the defendant in regard to that plan. The officer knew, but did not report to the Parole Board, that the defendant had been discharged from service in a cafeteria for drinking.

The defendant then introduced the members of the Virginia Parole Board and asked them if they had read the report of Dr. Brick, to which they replied in the affirmative.

Defendant also introduced Dr. Barrett, an interne at the hospital, who testified that he tried to talk to the prosecutrix but "never got anything from her." He was then shown what

purported to be the hospital history of the prosecutrix and read an entry therein made by him, stating, among other things, that "Patient denied that her privates had been attacked, but police stated that her attacker has admitted raping the patient. The patient's last menstrual period ceased yesterday. The patient says she doesn't think she was unconscious at any time." On cross-examination he said he first saw the prosecutrix on the examining table in the emergency room; that she was then semi-conscious, and he felt she did not understand what she was talking about.

The Commonwealth introduced in rebuttal the manager of the barber shop, who testified that the defendant's condition was perfectly normal during the day of May 5 from the time he came to work until he quit at 6:15 p. m.; that the last thing he did was to shines the shoes of the witness and the defendant was then entirely sober.

On the evidence in this record no substantial support can be found for the defendant's contention that the verdict was not supported by sufficient evidence.

Defendant argues that the medical report and Dr. Barrett's testimony show that the prosecutrix denied that she was attacked, and that the testimony of Morris, the arresting officer, shows that the incident was merely a mercenary transaction. That conclusion cannot be reached without brushing aside and ignoring overwhelming evidence of defendant's guilt, evidence which has convinced an impartial jury of men and women so completely that they have said by their verdict that the defendant's conduct merits the punishment of death.

In addition to the opinions of the two doctors who testified that the prosecutrix did not appear to know what she was saying in the hospital, two police officers went to the hospital to talk to her but she could not tell them her name and they left without trying to interview her. The photographs of the prosecutrix speak convincingly of her condition and alone might be adequate evidence of her irrational state. It is not necessary to repeat the evidence which demonstrates beyond peradventure that this was no bartering transaction, but a rape by force and violence.

The jury viewed the scene and were able to assay the testimony of the officers that the existing lights would not reach the places where the intercourse was had. Their verdict was amply supported by both oral and physical evidence.

Rape is the unlawful carnal knowledge of a woman by

force and against her will. *Young* v. *Commonwealth*, 185 Va. 1032, 1042, 40 S. E. (2d) 805, 810. It is punishable by death or confinement in the penitentiary for life, or for any term not less than five years. Code, 1950, § 18-54. The verdict of the jury was sanctioned by the law as well as by the evidence.

Defendant next contends that his confession should not have been admitted into evidence because it was obtained by duress, undue influence and promise of reward.

As shown in the recital of the evidence, there were oral admissions by the defendant on two occasions and also a written confession. The first admission of guilt was made to Durham and Mayo Sunday morning when they took the defendant to go over the scene. No objection or exception was made to the testimony concerning that admission. Again, after writing out his confession in the presence of Durham and Mayo, the admission of which is the subject of the assignment of error, the defendant admitted his guilt to the chief of police, Adams, giving the details of the occurrence. There was no objection or exception to the testimony as to this admission. The defendant did not deny making the oral admissions to Durham and Mayo nor did he claim that they were the product of any threat or coercion. He denied the admissions to Adams, which the city manager testified he heard. His written confession was of less detail and added little, or nothing, to his oral admissions of guilt.

Before the written confession was introduced into evidence Durham testified, and he was afterwards corroborated by Mayo, that it was given by the defendant without any duress, threats or promises and was made of the defendant's own free will and after he had been told that it could be used against him in evidence. The defendant was then put on the witness stand by his counsel and was asked how he happened to make the confession, and this was his reply:

"Well I made that confession on a little bit different basis that what he said. I was told I didn't get but ten years when I were in trouble before and I was told that if I told a lie about it or something like that, if I was caught up with I would get a lot more. I was already on parole and I figured it was best to go ahead and confess."

He said he wrote out two confessions, but he guessed the first one was destroyed. His counsel asked him, "In the second confession, did anyone comment that in making this confession, it cannot be any worse than it was before?" He replied, "That

was Mr. Mayo's statement. * * Mr. Mayo said, that I knew he gave me a break before." He was asked, "Did you figure that Mr. Mayo could do anything for you?" He replied, "Yes, sir, I did in a way." These questions and answers followed:

"Q. Did he say he would do anything for you?

A. Yes, sir, he told me that he looked after me before, he said it wouldn't be any worse.

Q. He told you that you might as well come on sign it?

A. Sure he said that.

O. Did he say you cannot be any worse off than you were before?

A. Yes, sir.

Q. Did he say you got ten years before and only served two of them?

A. Yes, sir.

Q. Had you had a consultation with a lawyer?

A. No.

Q. Did they advise you that your confession could be held against you?

A. No. sir."

■ Very clearly the written confession was admissible evidence. The Commonwealth's evidence was that it was voluntary. If the defendant's evidence can be said to controvert that, it at most raised an issue of fact which the court had to decide, the evidence being at most only conflicting. The admission of the confession was a finding of fact that it was voluntary, a finding entitled to the same weight as a finding of fact by a jury. The decision on the point was supported by credible evidence and is binding on this court on appeal. *Omohundro v. Commonwealth,* 138 Va. 854, 121 S. E. 908; *Johnson v. Commonwealth,* 184 Va. 466, 35 S. E. (2d) 770. We may add that we think the decision was clearly right.

After the admission of the confession its weight was for the jury. The full circumstances of its making were given to the jury. Durham testified that he told the defendant how to start off with the formality about the warrant; that the defendant had previously been served with a copy of the warrant and then taken before a justice of the peace and told he could possibly make bond; that he, Durham, told the defendant not to put anything in the statement but the truth because he expected to testify about it at the trial. Mayo testified that he did not tell the defendant that he might as well come on and sign the con-

fession, and that he did not tell him he would help him get off lightly this time if he signed; that he told the defendant that he did not have to tell them anything, and that they were not forcing him to do anything.

The defendant was asked whether this confession was made voluntarily and of his own free will and he said no; but he testified to little or nothing to implement his contention. He claimed no inducement beyond saying that Mayo said that he looked out for him when he was convicted before and "that he would really give me a break." But in the same answer he said, "I am on parole and I knew that if I pleaded not guilty of this crime that I would be sentenced to a much heavier sentence." He made no claim that he was mistreated by the officers, or that he was induced by force or fright to write the confession. The evidence is convincing that he was capable of intelligent action and that he acted calmly and without compulsion.

The defendant contends that the court did not pass upon the admissibility of the confession but left that question to the determination of the jury. The record does not support that claim. Out of the presence of the jury the court heard the evidence of Durham and of the defendant as to the circumstances of the confession, and then ruled, "I am going to admit it for whatever weight the Jury wants to give it." It is not open to question in this jurisdiction that the issue of the admissibility of a confession belongs to the court and not to the jury, and that the burden of proving that it was voluntary is on the Commonwealth. 7 Michie's Jur., Evidence, § 229, p. 608 and cases there cited. After its admission its weight and value are questions for the jury in connection with the other evidence in the case. *Upshur v. Commonwealth,* 170 Va. 649, 655, 197 S. E. 435, 437. In effect that was the procedure had in this case.

Lastly, the defendant says the court erred in overruling his objections to the statements of the Commonwealth's attorney in his argument comparing the defendant with the tiger or lion in the cage and with wild animals of the jungle.

The complete argument of the Commonwealth's attorney is set forth in the manuscript record. The part objected to at the trial and here made the subject of an assignment of error is quoted in the margin.[2] It is to be observed that there was no

[2]Now we can go into the question of this man's needing care, they brought that out, I didn't bring it out, and I have a right to mention it. He had been sentenced to the penitentiary before and had been down there for approximately two and a

motion for an instruction to disregard the argument and no motion for a mistrial because of it, both of which should have been made if the defendant desired to take advantage of his objection. *Hubbard* v. *Commonwealth*, 190 Va. 917, 931, 59 S. E. (2d) 102, 108; *Compton* v. *Commonwealth*, 190 Va. 48, 57, 55 S. E. (2d) 446, 450. But beyond that, the nature of the defendant's evidence, while not justifying any improper argument, permitted, if it did not invite, comment by the prosecutor.

The defendant introduced evidence of his previous conviction, his sentence to the penitentiary and his parole after serving about one-fourth of his ten-year sentence. He had the penitentiary psychiatrist read from his report of an examination made of the defendant soon after his entering the penitentiary to the effect that a prediction of the defendant's adjustment could not be made. He then introduced members of the Parole Board to inquire whether they had read that report. The purpose of that testimony was to put blame for what had happened upon the penal system of the Commonwealth.

The defendant also introduced evidence of his own drinking, of irrational conduct when drunk, of adverse home conditions and lack of proper guidance. He testified that he could adjust and behave himself under proper supervision; that he had a good record in the penitentiary and that if he could get training and help from such people as the psychiatrist and officials at the penitentiary he could stop drinking. This evidence was an appeal to the jury for light punishment, which of course he had a right to make, and which the Commonwealth's attorney had a right to combat, and to argue the evidence and the fair inferences from it with respect both to the defendant's guilt and to a fitting punishment. He did not liken the defend-

half years and released under the parole system, and the blame is thrown on the Commonwealth, that he wasn't taken care of. Now, I feel sorry for anyone, who is in trouble, I also feel sorry for the wild animals of the jungle—

MR. SWANSON: I object to that.

THE COURT: The objection is overruled.

MR. WOOD: When I go into the circus or the menagerie and see him confined. I feel sorry for any animal that has been confined, but that doesn't mean that the tiger in the cage or the lion in the cage, that I should get up there and release him on a civilized community to damage or injure whomsoever he will—

MR. SWANSON: If the Court please, I object.

THE COURT: The objection is overruled.

MR. SWANSON: I except.

MR. WOOD: Society has got to protect itself and the only way I know to protect itself, is to either lock up or put to death, those, who cannot control themselves or cannot avail themselves of the proper defense to crime.

ant to a wild animal of the jungle or a tiger or lion in the cage, but used them to illustrate his argument against the jury's dealing with the defendant as the defendant sought to have them do.

We have said in a number of cases that the Commonwealth's attorney represents the public in the prosecution of crime and the public he represents does not desire the punishment of the innocent or excessive punishment of the guilty. He must treat the defendant fairly and justly and scrupulously avoid depriving him of any legal right. We have not hesitated to reverse cases when it appeared that the Commonwealth's attorney had made prejudicial argument not based upon the evidence or the fair inferences from it. *McLean* v. *Commonwealth,* 186 Va. 398, 43 S. E. (2d) 45; *Harrison* v. *Commonwealth,* 183 Va. 394, 32 S. E. (2d) 136; *Bateman* v. *Commonwealth,* 183 Va. 253, 32 S. E. (2d) 134; *Taylor* v. *Commonwealth,* 180 Va. 413, 23 S. E. (2d) 139; *McReynolds* v. *Commonwealth,* 177 Va. 933, 15 S. E. (2d) 70.

But these cases do not hold that a Commonwealth's attorney shall not prosecute with vigor or shall not argue with force when there is substantial evidence of guilt; and while we do not approve the argument objected to in this instance, we are clearly of opinion that it was not reversible error under the facts and circumstances of this case. See *Williams* v. *Commonwealth,* 188 Va. 583, 50 S. E. (2d) 407.

The record shows a carefully conducted trial, with liberality to the defendant in admitting evidence he asked to introduce, and with no effort or purpose to deprive him of any legal right. The jury were fairly and adequately instructed; no objection was made to any instruction given for the Commonwealth and none offered by the defendant was refused. He has been sentenced to receive the maximum punishment of the law, but he has had a fair trial and the judgment against him must be

*Affirmed.*