# Staunton

JESSE THOMAS PERRY v. COMMONWEALTH OF VIRGINIA.

September 8, 1967.

Record No. 6483.

Present, All the Justices.

*Thomas L. Woodward* for plaintiff in error.

*A. R. Woodroof, Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for defendant in error.

I'ANSON, J., delivered the opinion of the court.

Defendant, Jesse Thomas Perry, was convicted on an indictment charging that he did unlawfully and feloniously set up, promote, and was concerned in the operation and conduct of a lottery, known as

the numbers game, in violation of Code § 18.1-340, as amended, and he was sentenced, in accordance with the jury's verdict, to eight years in the penitentiary and fined $5,000. We granted defendant a writ of error to the judgment.

Defendant contends that (1) the evidence was insufficient to support the conviction; (2) the search warrant did not authorize a search of the entire dwelling house; (3) federal gambling tax stamps and certain other evidence were inadmissible; (4) the verdict of the jury was excessive; and (5) the whole proceeding was vitiated by the police officers' custodial interrogation.

The evidence shows that on April 23, 1965, a search warrant was obtained to search the premises of the defendant, located at 216 Forest street, in the city of Suffolk, Virginia, for paraphernalia being used in the operation of a "numbers lottery." Detective Bryant, one of the several police officers who went to the above address to make the raid, read the search warrant to the defendant and asked him if he occupied the entire house. Defendant replied that he did. Bryant then directed Officer Mundy, who had entered the house by the downstairs backdoor, to search the upstairs for lottery paraphernalia.

On the second floor Mundy found Charles Eley sitting at a table in a bedroom. On the table were numerous stacks of numbers books, numbers slips, paper bags, an adding machine, and $123.26 in "numerous denominations."

Mundy called downstairs and asked Detective Bryant, Officer Reilly and the defendant to come upstairs. Defendant was immediately advised that he did not have to make any statement, that he was entitled to a lawyer before saying anything, and that any statements he made could be used against him in court.

When Perry entered the upstairs bedroom he said, "Well, I didn't know this was here." Mundy then asked Eley, in the presence of the defendant, "Do you live here?" and he answered, "No." Defendant began shaking his head, and Eley then said, "Sometimes." Mundy told defendant they were going to search the rest of the house and defendant said, "Mr. Mundy, you are wasting your time. You have got it all right here."

While the officers and defendant were proceeding downstairs, defendant voluntarily admitted that he had control over the entire house; that the telephone was listed in his name; and that the city directory listed him as an occupant of the house.

Items found in the search of the downstairs included numerous

boxes of money wrappers, small brown paper bags, rubber bands, and a stapler. While the search was being made the telephone rang and Mundy attempted to answer it, but defendant grabbed the phone, shouted "That's Mundy," and slammed the telephone down. During this time a man came to the front door of the house with numbers books, numbers slips and money, which were taken from him by the officers. A second man, James Littlejohn, came to the back door. When he saw the officers he ran away, but Officer Reilly overtook him and obtained from him a quantity of numbers books, numbers slips and money.

Defendant was placed under arrest and searched. Five federal occupational gambling tax stamps, one of which was current, were found in his wallet. Money was also taken from his wallet and his coat and pants pockets.

Officer Mundy testified that he was familiar with the operation of the numbers game. He said the numbers slips found on the premises and taken from the two men coming to the house were wagered on numbers derived from the results of horse races. He explained to the jury how the game was played and stated that the code numbers on the confiscated numbers books and slips showed that the numbers were written by fifty-three different persons.

Defendant testified that the officers misunderstood his statement concerning his control over the entire house. He said he lived with his wife at another address in the city of Suffolk; that he rented the downstairs apartment on Forest street over ten years ago in order to have somewhere to go and to "have quite a few friends sometimes to come around;" that he first bought a federal gambling stamp in 1962 because he participated in craps games; that he was not employed, but had a financial interest in a barber shop; and that the money wrappers and paper bags found downstairs were used to handle the money taken out of the music box on the premises.

Defendant argues that the evidence was insufficient to support the jury's verdict and the judgment entered thereon.

Code § 18.1-340, as amended, provides *inter alia* that if any person set up, promote, or be concerned in managing or drawing a lottery, or knowingly permit such a lottery in any house under his control, he shall be punished as provided (for a misdemeanor). But when such violation shall consist of the operation or conduct of a lottery commonly known as the numbers game or racket, he shall be punished by confinement in the penitentiary not less than one year nor more

than ten years and fined not less than $500, or, etc. (for a felony).

It is settled law in this Commonwealth that in prosecutions under Code § 18.1-340 actual possession of lottery paraphernalia is not necessary for a conviction, and that a violation of this statute can be shown by either direct or circumstantial evidence, or both. *Hayden v. Commonwealth*, 203 Va. 398, 401, 124 S. E. 2d 13, 15 (1962); *Riggan v. Commonwealth*, 206 Va. 499, 505, 144 S. E. 2d 298, 302 (1965), reversed on other grounds, 384 U. S. 152, 86 S. Ct. 1378, 16 L. ed. 2d 431 (1965).

Defendant's voluntary admissions to the officers show that he occupied and had under his control the entire house where numbers books, numbers slips, money and other paraphernalia used in connection with the conduct and operation of a numbers game were found. After Officer Mundy found the gambling paraphernalia in an upstairs bedroom defendant told Mundy that it was unnecessary for them to search the rest of the house because they had it all. While the officers were still on the premises, two "runners," with a quantity of numbers books, numbers slips and money, arrived for the obvious purpose of reporting their activity to headquarters. The adding machine, the large amounts of small change, the number of wagers placed, and the number of people involved all show the magnitude of the operation. It is inconceivable that defendant had no knowledge of such activity in a house which he occupied and controlled. The action of the defendant in preventing Mundy from intercepting the telephone call could indicate that the call had some relation to the operation of the numbers lottery. Defendant did not work anywhere, yet he said he maintained two houses. The large quantity of money wrappers, rubber bands and paper bags found downstairs in the dwelling are articles used in handling money, numbers books and numbers slips.

The facts and circumstances presented evidence from which a jury could find that the defendant set up, promoted and was concerned in the operation of the numbers racket. Thus we hold that the evidence was sufficient to support the conviction.

Defendant argues that the search warrant did not authorize a search of the second floor of the dwelling. There is no merit in this argument. The language of the search warrant authorized a search of the premises occupied by the defendant at 216 Forest street. It was not limited to a search of the downstairs. Moreover, the evidence shows, and it was admitted by defendant, that he did occupy and control the entire two-story dwelling house.

[2] Defendant objected to the admissibility of the federal gambling tax stamps on the sole ground that they were immaterial and prejudicial.

The federal gambling tax law requires any person engaged in accepting wagers placed in a lottery[1] conducted for profit to pay a $50 occupational tax, file a registration form with the district office of the Internal Revenue Service listing his name and address and those of others associated with him, and to pay taxes of ten percent on the gross amount of wagering done. 26 U.S.C.A. §§ 4401, 4411, 4412, 4421. An occupational tax stamp is issued upon the filing of the completed registration form and the payment of the $50 required tax. The federal law specifically provides that payment of any tax imposed under the federal gambling tax statutes does not exempt any person from penalty or punishment of offenses provided by the law of any State. 26 U.S.C.A. § 4422.

In *Irvine* v. *California*, 347 U. S. 128, 74 S. Ct. 381, 98 L. ed. 561 (1954), the Supreme Court upheld the right of a State to introduce in evidence a federal gambling tax stamp, petitioner's application for the stamp, and his return to the Collector of Internal Revenue in a prosecution for violation of the State's gambling laws. For other cases holding that a federal tax stamp is admissible in a State prosecution for violating its laws against gambling, see *McClary* v. *State of Tennessee*, 211 Tenn. 46, 55-56, 362 S. W. 2d 450, 454-456 (1962); *State* v. *Mills*, 229 La. 758, 86 So. 2d 895, 898-899 (1956); *State* v. *Curry*, 92 Ohio App. 1, 109 N. E. 2d 298 (1952). Some States have made the possession of a gambling tax stamp and returns filed pursuant to requirements of their statutes and the federal statutes prima facie or even conclusive evidence of violations of their gambling laws. *Long* v. *State*, 39 Ala. App. 372, 377-378, 105 So. 2d 136, 141 (1955) (reversed on other grounds, 268 Ala. 1, 105 So. 2d 144 (1957)); *Deitch* v. *Chattanooga*, 195 Tenn. 245, 258 S. W. 2d 776, 778 (1953) (where city ordinance made possession of gambling stamps a crime). Compare, *Commonwealth* v. *Fiorini*, 202 Pa. Super. 88, 94, 195 A. 2d 119, 122 (1963), where it was held that the seizure of a gambling tax stamp hanging on the wall in a pool room during a search for lottery paraphernalia was illegal since it was not an instrument used in gambling, but a receipt for a tax. The tax stamp

---

1. The term "lottery" under 26 U.S.C.A. § 4421 includes the numbers game, but does not include card and dice games. See legislative history. U.S. Code Cong. & Adm. News (1951), p. 1840.

was admitted in evidence, however, but the trial court told the jury that it was to be considered by them for the limited purpose of showing that the person whose name appeared on the stamp had control over the premises.

In the present case defendant did not ask the court to instruct the jury that the gambling stamps were to be considered by them for a limited purpose, since he took the position that the tax stamps were not admissible for any purpose.

Defendant has not cited any case, nor have we been able to find any in our independent research, holding that a federal gambling tax stamp is inadmissible in a State prosecution for violation of its gambling laws, at least for some purposes. We hold that the federal gambling stamps are admissible as evidence to show that defendant purchased the occupational stamps for the purpose of engaging in the business of conducting a lottery for profit.

We are not unmindful of the fact that the question of the constitutionality of the federal gambling tax laws, which was not raised by defendant in the present case as a reason for the inadmissibility of the stamps, is now pending in the Supreme Court of the United States in the cases of *United States* v. *Costello*, 352 F. 2d 848 (2d Cir. 1965), cert. granted 383 U. S. 942, 86 S.Ct. 1195, 16 L. ed. 2d 205 (1966); *Marchetti* v. *United States* (see opinion in *Costello*), cert. granted, 385 U.S. 1000, 87 S. Ct. 698, 17 L. ed. 2d 540 (1967); and *Grosso* v. *United States*, 358 F. 2d 154 (3d Cir. 1966), cert. granted, 385 U. S. 810, 87 S. Ct. 47, 17 L. ed. 2d 53 (1966), on the ground that the federal gambling laws violate the privilege against self-incrimination guaranteed by the Fifth Amendment to the Constitution of the United States. Although the constitutionality of the federal laws was upheld in *United States* v. *Kahriger*, 345 U. S. 22, 73 S. Ct. 510, 97 L. ed. 754 (1953), and again in *Lewis* v. *United States*, 348 U. S. 419, 75 S. Ct. 415, 99 L. ed. 475 (1955), it appears that the Court granted certiorari in *Costello*, *Marchetti* and *Grosso* in the light of its recent holdings in *Albertson* v. *Subversive Activities Control Bd.*, 382 U. S. 70, 86 S. Ct. 194, 15 L. ed. 2d 165 (1965), and *Murphy* v. *Waterfront Commission of New York Harbor*, 378 U. S. 52, 84 S. Ct. 1594, 12 L. 2d 678 (1964). There is also pending before the Court in *Rainwater* v. *Florida*, 186 So. 2d 278 (Fla. 1966), the question of whether evidence of gambling paraphernalia obtained under a search warrant by federal authorities is inadmissible in a State lottery prosecution. 385 U. S. 944, 87 St. Ct. 321, 17 L. ed.

2d 224 (1966). See note, "Self-Incrimination and the Federal Excise Tax on Wagering," 76 Yale L. J. 839 (March 1967).

Defendant's contention that the court admitted in evidence a statement made by James Littlejohn to the police officers out of the presence of the defendant is not borne out by the record. The record shows that the trial court ruled that the evidence was hearsay and thus inadmissible.

[3] Defendant contends the jury's verdict was so excessive that it demonstrates an arbitrary and capricious act on their part. He argues that the punishment fixed by the jury was not proportionate to that fixed in cases involving similar offenses, and from this premise he says his punishment was excessive.

The principle has long been recognized in this Commonwealth that when the verdict of a jury imposes a penalty within the limitations prescribed by the statute governing the crime charged in the indictment, this court will not interfere with a judgment entered on the jury's verdict merely on the ground of abuse of discretion. *Messer* v. *Commonwealth*, 145 Va. 872, 879, 134 S. E. 565, 567 (1926); *McCann* v. *Commonwealth*, 174 Va. 429, 448, 4 S. E. 2d 768, 775 (1939).

No affidavits were filed by the defendant in the court below to show that the jury was prejudiced against him or that they were guilty of any misconduct. The punishment fixed was within the limits prescribed by the statute, and the judgment entered on the jury's verdict will not be disturbed by us.

[4] Lastly, defendant says that the whole proceeding against him was vitiated by the holding in *Miranda* v. *Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694 (1966). He argues that the questions asked him by the police officers required him to make answers to his prejudice.

The evidence shows defendant was advised that he did not have to answer any questions; that he was entitled to representation by counsel before making any statement; and that any statements made by him could be used against him in court. There is not a scintilla of evidence that he was forced by the police to make any statements. He made no complaint during the trial that he had been badgered into making any statements. The statements made by the defendant were entirely voluntary. The holding in *Miranda* has no application under the facts here. Moreover, *Miranda* is not to be applied retroactively. It is to be applied only to those cases in which the trial

began after June 13, 1966, the date of the decision. See, *Johnson* v. *New Jersey*, 384 U. S. 719, 86 S. Ct. 1772, 16 L. ed. 2d 882 (1966). The trial in the present case was held on November 13, 1965, which was before *Miranda*.

For the reasons stated, the judgment of the court below is

*Affirmed.*